**SO ORDERED.**

**SIGNED this 10 day of August, 2015.**

*Stephani W. Humrickhouse*

**Stephani W. Humrickhouse**
**United States Bankruptcy Judge**

---

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### RALEIGH DIVISION

**IN RE:**

**WILLIAM D. PARKER, JR. and**                    **CASE NO. 12-03128-8-SWH**
**DIANA LYNNE PARKER,**

    **DEBTORS.**


**WILLIAM D. PARKER, JR. and**
**DIANA LYNNE PARKER,**

    **Plaintiffs**                    **ADVERSARY PROCEEDING**
                                     **NO. 13-00055-8-SWH-AP**

    **v.**

**CONAN R. MCCLAIN**

    **Defendant.**


### ORDER REGARDING MOTION FOR SUMMARY JUDGMENT

This matter came on before the court upon the motion for summary judgment filed by Conan McClain ("McClain"), the defendant in this adversary proceeding. A hearing was held on February 4, 2015, in Raleigh, North Carolina.

## BACKGROUND

William Parker, Jr. and Diana Lynne Parker (collectively, the "Parkers"), the plaintiffs in this adversary proceeding and the debtors in the main bankruptcy case,[1] own various tracts of real property in North Carolina, and prior to filing for bankruptcy, had engaged in the business of developing real estate in and around Raleigh. The Parkers operated their business through two companies in which they are the primary shareholders and officers, Gregory & Parker, Inc. ("G&P"), and Gregory & Parker – Seaboard, LLC (collectively, "the Companies"). Particularly relevant to this action is the Companies' ownership of real estate located near downtown Raleigh referred to as Seaboard Station.

The parties' interactions leading up to this lawsuit are largely contested, but the undisputed background facts are recounted as follows. In or around 1999, Mr. Parker hired William Russ ("Russ") to manage Seaboard Station, but the Parkers retained decision making authority and control over the Companies' bank accounts. At some point later in time, a decision was made to engage in a redevelopment project at Seaboard Station, and in 2004, G&P contracted with Trammell Crow Company ("Trammell Crow") for development services. McClain was vice president of Trammell Crow at the time of its involvement in the project, but sometime thereafter resigned from that company. In 2005, G&P terminated its contract with Trammell Crow due to dissatisfaction with its performance. However, McClain was retained by G&P in his individual capacity to continue with

---

[1]Unfortunately, at some point after the February 4, 2015 hearing, the court was informed that Mr. Parker passed away. Pursuant to Bankruptcy Rule 1016, the court deems it to be possible, and in the best interest of the parties, for Mr. Parker's case to proceed. Fed. R. Bankr. P. 1016.

redevelopment efforts at Seaboard Station.[2]  McClain mainly reported to Russ, who was primarily responsible for reporting to the Parkers at their home in Johnston county, but McClain sometimes reported directly to the Parkers at their home.

During his involvement with the Seaboard Station project, McClain helped pursue lease agreements and also facilitated loans to the Companies and the Parkers.  In exchange, McClain received paychecks from G&P, was paid commissions with respect to certain leases entered into between the Companies and Seaboard Station tenants, and was also paid sums out of loan proceeds.[3] McClain also received payments in accordance with a stabilization fee, the propriety of which is in dispute, once Seaboard Station reached 75 percent occupancy.

In 2008, a new entity, Gregory & Parker – Seaboard II, LLC ("G&P – Seaboard II"), was formed for the purpose of developing an apartment site at Seaboard Station.  McClain was retained to provide development services related to the apartment project, and entered into a contract with G&P – Seaboard II for such services.  In 2010, McClain created RPM Redline, LLC ("Redline"), in which he and Russ were each member-managers and in which each owned a 50 percent interest. The apartment project's feasibility was dependent on G&P – Seaboard II obtaining ownership or control of a portion of contiguous property owned and/or controlled by the Triangle Transit Authority ("TTA").  McClain proceeded with efforts to develop the apartments, including assisting with the procurement of loans in the amount of $2,550,000.00 and $1,400,000.00 from Georgia Capital, LLC, and entering into a contract on behalf of G&P – Seaboard II[4] with CF Evans & Co.

---

[2]The parties disagree on whether there was ever a written agreement between G&P and McClain for McClain to serve as developer or broker at Seaboard Station.

[3]The legitimacy and authority for these payments is disputed.

[4]McClain's authority to have entered into this contract is disputed.

Construction Services, LLC ("CF Evans") to demolish and remove an existing structure on the apartment site. Ultimately, however, G&P – Seaboard II did not acquire use of the TTA property and the apartment project failed.

On February 22, 2012, the Companies filed chapter 11 petitions,[5] and on April 25, 2012, the Parkers filed a chapter 11 petition in bankruptcy. On March 25, 2013,[6] the Companies, through the Parkers, filed suit against McClain alleging fourteen causes of action: preferential transfers; fraudulent transfers; breach of fiduciary duty; constructive fraud; fraud; negligent misrepresentation; negligence; breach of contract; collection on guaranty; conversion; unfair or deceptive trade practices; disallowance of claim; setoff; and equitable subordination (the "Companies' Adversary Proceeding"). The Companies' Adversary Proceeding was resolved by Order dated June 11, 2014, which approved a settlement and compromise among the parties. Gregory & Parker, Inc. v. McClain (In re Gregory & Parker, Inc.), Adv. Pro. No. 13-00052-8-SWH (Bankr. E.D.N.C. June 11, 2014). The Parkers individually initiated the present adversary proceeding against McClain in this bankruptcy case on March 27, 2013,[7] asserting causes of action for fraudulent transfers under the North Carolina Uniform Fraudulent Transfer Act; breach of fiduciary duty; constructive fraud; fraud; negligent misrepresentation; negligence; conversion; unfair or deceptive trade practices; disallowance of claim; setoff; and equitable subordination. On November 12, 2014, McClain filed a motion for summary judgment as to all of the Parkers' claims.

--------

[5]The Companies' bankruptcy cases were later consolidated and ultimately converted to chapter 7.

[6]A First Amended Complaint was filed on July 8, 2013.

[7]A First Amended Complaint was filed on July 8, 2013.

4

## DISCUSSION

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  In making this determination, the court views all facts and inferences to be drawn from the facts in the light most favorable to the nonmoving party. U.S. v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam).  Summary judgment is not a "disfavored procedural shortcut," but an important mechanism for filtering out baseless claims and defenses. Celotex, 477 U.S. at 327.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323.

Before considering whether the Parkers' claims survive summary judgment on substantive grounds, the court turns its attention to McClain's affirmative defenses of lack of standing, *res judicata*, and judicial estoppel.  McClain asserts that the Parkers lack standing as to all of their claims against him because the claims belong to the Companies, and the Parkers do not allege any unique, distinct harm.  See Barger v. McCoy Hillard & Parks, 346 N.C. 650, 658-59, 488 S.E.2d 215, 219 (1997).  However, to the extent that the Parkers allege harm resulting from McClain's allegedly wrongful conduct in counseling them to take out loans in their individual names, become guarantors of the Companies' loans, pledge their personal property as security, and sign promissory notes to McClain, the court cannot conclude as a matter of law that the Parkers lack standing as to all of their claims because genuine issues of material fact exist regarding these allegations.  See id., 346 N.C. at 662, 488 S.E.2d at 221.

5

McClain is also not entitled to summary judgment as to his *res judicata* and judicial estoppel affirmative defenses.  McClain argues that the Parkers' claims against him are barred by the settlement agreement entered into in the Companies' Adversary Proceeding.  McClain relies upon Smoky Mountain Enterprises, Inc. v. Rose, 283 N.C. 373, 196 S.E.2d 189 (1973), for the proposition that "[a] person who is not a party but who controls an action . . . is bound by the adjudications of litigated matters as if he were a party if he has a proprietary interest or financial interest in the judgment or In [sic] the determination of a question of act [sic] or a question of law with reference to the same subject matter, or transactions . . . ."  283 N.C. at 377, 196 S.E.2d at 192 (quoting Thompson v. Lassiter, 246 N.C. 34, 97 S.E.2d 492 (1957)) (internal quotations omitted).  McClain urges that the Parkers, as sole shareholders and members of the Companies, are bound by the settlement.  However, the quoted principle is inapplicable to the matter at hand in several respects.  Although the Parkers were shareholders and members of the Companies, upon conversion of the Companies' bankruptcy case to chapter 7, the chapter 7 trustee was substituted as plaintiff and the Parkers were no longer in control of the action, including the decision to settle.

More importantly, the settlement agreement does not bar the Parkers' claims because the settlement itself explicitly states that it has no effect on this adversary proceeding.  As the U.S. Court of Appeals for the Fourth Circuit[8] has held, when a dismissal is based on a settlement agreement, the principles of *res judicata* apply in a modified form, and only apply to "matters specified in the settlement agreement, rather than the original complaint."  U.S. ex rel. May v. Purdue Pharma L.P., 737 F.3d 908, 913 (4th Cir. 2013) (quoting Norfolk S. Corp. v. Chevron, U.S.A., Inc., 371 F.3d

---

[8]The preclusive effect of a federal court judgment is governed by federal common law. U.S. ex rel. May v. Purdue Pharma L.P., 737 F.3d 908, 912 (4th Cir. 2013) (citing Taylor v. Sturgell, 535 U.S. 880, 891 (2008).

1285, 1288 (11th Cir. 2004)) (internal quotations omitted).  Because a settlement agreement is contractual in nature, the preclusive effect of a judgment based on such an agreement can be no greater than the agreement itself.  Purdue Pharma, 737 F.3d at 913.  Additionally, the intent of the parties to the agreement determines the extent of the preclusive effect.  Id. (citing Keith v. Aldridge, 900 F.2d 736, 740 (4th Cir. 1990)).  The settlement agreement cannot bar the Parkers' claims against McClain because it specifically states that "McClain understands that this release shall not include any claims as to which the Parkers or their estate are a real party in interest, including claims asserted in AP No. 13-00055-8-SWH, to the extent the Parkers or their estate is a real party in interest."  Gregory & Parker, Inc. v. McClain (In re Gregory & Parker, Inc.), Adv. Pro. No. 13-00052-8-SWH, at *5-6 (Bankr. E.D.N.C. June 11, 2014).  In light of this explicit provision, the preclusive effect of the settlement agreement does not extend beyond the Companies' claims.  The court also notes that the trustee did not seek to compromise the Companies' Adversary Proceeding because he believed the claims were without merit, but because he determined that McClain was judgment proof, and that therefore, it was "economically beneficial for the bankruptcy estate" to accept the settlement rather than pursue costly litigation.  Trustee's Motion to Compromise Adversary Proceeding, Adv. Pro. No. 13-00052-8-SWH, Doc. No. 71 at 7.  Therefore, the court will grant summary judgment to the Parkers on McClain's *res judicata* defense as to any claims for which it is ultimately found the Parkers have standing. Fed. R. Civ. P. 56(f); Fed. R. Bankr. P. 7056.

Finally, McClain argues that the Parkers' claims are barred by the doctrine of judicial estoppel because the Parkers re-allege the same facts asserted by the Companies as a basis for their claims in their individual capacity.  Additionally, McClain contends that the Parkers' claims are "patently inconsistent" with the settlement agreement.  The court finds that judicial estoppel is

inapplicable.  This doctrine, used to preserve the integrity of judicial proceedings, "precludes a party from adopting a position that is inconsistent with a stance taken in prior litigation."  Lowery v. Stovall, 92 F.3d 219, 223 (4th Cir. 1996) (quoting John S. Clark Co. v. Faggert & Frieden, P.C., 65 F.3d 26, 28-29 (4th Cir. 1995)) (internal quotations omitted).  In contrast to *res judicata*, which seeks to protect litigants, judicial estoppel protects courts from parties that play "fast and loose" with the judicial system.  Id.  Before applying judicial estoppel, the court must satisfy itself of certain elements: (1) the party sought to be estopped must be seeking to adopt a position inconsistent with a stance it took in prior litigation; (2) the position must be one of fact, rather than law; (3) the prior inconsistent position must have been accepted by the court; and (4) the party sought to be estopped must have intentionally misled the court to gain an unfair advantage.  Lowery, 92 F.3d at 224.

The standards for judicial estoppel clearly do not apply in this case because the first element cannot be satisfied.  As already highlighted in the *res judicata* discussion, the settlement agreement explicitly provides for the survival of the Parkers' claims against McClain, and thus, no inconsistency exists.  Additionally, the Parkers have not made inconsistent *factual* assertions; at most, they have asserted inconsistent *legal* theories, namely, that the facts support individual causes of action.  The court will grant summary judgment to the Parkers on McClain's judicial estoppel defense.  Fed. R. Civ. P. 56(f); Fed. R. Bankr. P. 7056.

The court will now address the substantive bases asserted by McClain in support of his summary judgment motion.

*A. Breach of Fiduciary Duty*

The Parkers allege that a fiduciary duty existed with McClain both at law and in fact, and that he breached that duty by: (1) pursuing high-risk financing and development strategies that were

8

inappropriate for unsophisticated parties such as the Parkers; (2) taking part ownership in a Seaboard Station tenant, and using the Companies' and/or the Parkers' funds to prop up that tenant in order to obtain a loan from Regions Bank, from which he was ultimately paid significant proceeds; (3) allowing Seaboard Station tenants to fall behind on rent; (4) causing Mr. Parker to execute a promissory note for an alleged stabilization fee; (5) causing the Parkers to borrow money from Georgia Capital without first taking the necessary steps to ensure that G&P – Seaboard II could acquire ownership of the TTA property; (6) counseling the Parkers to personally incur financing and pledge substantially all of their assets as security; (7) engaging in an inappropriate relationship with the Companies' bookkeeper; and (8) and causing Mr. Parker to pay him some $333,830.00.  With these allegations in mind, the court turns to the law.

It is fundamental that, in order for a fiduciary duty to exist, there must first be a fiduciary relationship.  Dalton v. Camp, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001).  A fiduciary relationship exists where "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." Id. (quoting Abbitt v. Gregory, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931)) (internal quotations omitted).  "Only when one party figuratively holds all the cards – all the financial power or technical information, for example – have North Carolina courts found that the special circumstance of fiduciary relationship has arisen." SNR Mgmt. Corp. v. Danube Partners 141, LLC, 189 N.C. App. 601, 613, 659 S.E.2d 442, 451 (2008) (quoting Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 348 (4th Cir. 1998)) (internal quotations omitted).  There are two types of fiduciary relationships recognized in North Carolina: (1) those arising from certain legal relationships, such as attorney and client or broker and client, and (2) those existing "in fact" due

to "confidence reposed on one side, and [] resulting superiority and influence on the other." Danube Partners 141, LLC at 613, 659 S.E.2d at 451 (quoting Rhone-Poulenc Agro S.A. v. Monsanto Co., 73 F. Supp. 2d 540, 546 (M.D.N.C. 1999)) (internal quotations omitted).

There is no distinct definition for a fiduciary relationship in fact; whether such a relationship exists depends on the facts and circumstances in each case. HAJMM Co. v. House of Raeford Farms, Inc., 328 N.C. 578, 588, 403 S.E.2d 489 (1991). Courts have founds that the existence of superior knowledge, trust and inexperience are insufficient to establish a fiduciary relationship. See Eastover Ridge, LLC v. Metric Constructors, Inc., 139 N.C. App. 360, 533 S.E.2d 827 (2000) (superior knowledge insufficient); see also River's Edge Pharm., LLC v. Gorbec Pharm. Servs., Inc., No. 1:10CV991, 2012 WL 1439133 (M.D.N.C. April 25, 2012) (trust and inexperience alone insufficient). Rather, for a fiduciary relationship to arise in fact, there must be "control and domination." Rhone-Poulenc Agro S.A. v. Monsanto Co., 73 F. Supp. 2d at 546. Relevant factors for determining the existence of a fiduciary relationship may include: "the degree of kinship between the parties, the disparity in age, health, mental condition and education and business experience between the parties; and the extent to which the 'servient' party entrusted the handling of its business affairs to the 'dominant' party and placed trust and confidence in it." Smith v. GMAC Mortg. Corp., No. 5:06CV125-V, 2007 WL 2593148, at *6 (W.D.N.C. Sept. 5, 2007) (quoting Monsanto, 73 F. Supp. 2d at 546 (incorporating factors identified by Illinois courts; court discussed both Illinois and North Carolina law, as parties agreed that both states require similar showings)) (internal quotations omitted). Further, the Monsanto court stated that such a relationship will not be found where "there is no evidence that the alleged fiduciary agreed to exercise its judgment on behalf of the alleged dependent party." 73 F. Supp. 2d at 546.

The Parkers allege that a fiduciary relationship existed with McClain at law by virtue of McClain's service as either a real estate broker or as an agent, both of which are historically recognized fiduciaries.  See Howard v. Carroll Cos., Inc., No. 1:12CV146, 2013 WL 3791619, at *5 (M.D.N.C. July 19, 2013).  The Parkers also allege that a fiduciary relationship exists in fact in light of the professional advice and services McClain provided to the Parkers, upon which they relied heavily.  The Parkers maintain that they have no training, background or experience with bookkeeping, accounting, property management, property development or commercial loans, and as such, they relied entirely on McClain's advice.  The Parkers state that McClain knew of their exclusive and explicit reliance and assured them that he made recommendations in their best interests.  This, contend the Parkers, combined with their lack of relevant education and experience, placed McClain in a position of dominance over them.  In support of their asserted reliance, the Parkers offer the affidavits of several professionals employed by the Companies.  Jeffrey Ellinger ("Ellinger"), counsel for the Companies, states that he was generally not sought out for advice:

> My firms' primary contact with the Companies was initially William Russ.  Later, our primary contacts also included Casey Russ . . . and Conan McClain. . . . I met with Mr. and Mrs. Parker very rarely in relation to my representation of the Companies–probably 10 or fewer times in total.  I and other attorneys at my firms did not routinely consult with, advise or take instruction from Mr. or Mrs. Parker on matters relating to the Companies. . . .  The Companies typically did not involve me and my firms with its business and financial decisions.  Rather, decisions would typically be made without our involvement, and we would be asked to provide legal services only when needed for a specific purpose.

Ex. C to Pl. Parkers' Supp. Resp. in Opp., Doc. No. 110-3 at 3.  Ellinger further observed that "Mr. Russ and the Parkers relied upon Mr. McClain's professed expertise to guide them regarding development of the Seaboard Station retail and apartment properties and procuring suitable financing to advance that development."  Id. at 4.  Likewise, the affidavit of James Tiller ("Tiller"),

11

a certified public accountant at the accounting firm used by the Companies, stated that his firm did not communicate directly with the Parkers or advise them on important decisions, and that McClain and Russ kept the firm at arms length.  See id., Ex. D, Doc No. 110-3 at 9.  Tiller stated that his firm's primary contact with the Companies was through Russ and McClain.

In further support of this claim, the Parkers maintain that McClain caused them to grossly overextend themselves by obtaining high risk loans for development purposes in their own names, signing personal guarantees and pledging substantially all of their personal property as security. According to the Parkers, McClain advised them to execute personal guarantees of an interest rate swap agreement, a complicated and high-risk transaction that was inappropriate for unsophisticated borrowers such as themselves, between G&P and Regions Bank.  Additionally, they allege that McClain counseled Mr. Parker in his individual capacity to execute a promissory note to McClain in the amount of $1,461,629.00 based on McClain's representations that it was needed to secure McClain's ownership interest in the apartment project. The Parkers allege that McClain represented to them that he was required to have an ownership interest in the apartment project in order to obtain HUD financing, and as a result, an agreement was reached that McClain would have a 25 percent ownership interest in the apartment site as compensation.  In connection with the agreement, Mr. Parker was approached by McClain with the promissory note, allegedly to secure McClain's entitlement to the 25 percent interest. Mr. Parker asserts that although the note referenced an exhibit showing a calculation, no exhibit was presented to Mr. Parker at the time of execution on October 12, 2007.  Rather, the exhibit attached to the version of the note filed with McClain's proof of claim bears a date of October 22, 2008, and purports to be a calculation of the stabilization fee to which McClain claims entitlement.  Mr. Parker contends that the note was not presented to him as a

12

personal promise to pay fees to McClain.  Further, the Parkers state that the calculation of the stabilization fee is flawed in that it includes buildings developed by Trammell Crow, includes questionable or illusory leases in order to reach the 75 percent threshold, and uses figures that do not correspond with G&P's books and records.

The Parkers also maintain that in taking out loans from Georgia Capital, which included egregious terms and from which McClain was paid a substantial fee, they relied on McClain's representations that the appropriate arrangements were in place for the vitality of the project.  In particular, the Parkers contend that McClain assured Mr. Parker that G&P – Seaboard II would be able to acquire ownership or control of the TTA property, which was vital to the success of the apartment project.  The Georgia Capital loans were extended to Mr. Parker and guaranteed by G&P and Mrs. Parker.[9]

McClain, however, asserts that if any fiduciary relationship and accompanying duties existed, it was with respect to the Companies, not the Parkers individually.  McClain contends that he was employed by, and performed services for, the Companies, and that the Parkers' allegations relate only to harm to the Companies rather than to themselves.  Furthermore, McClain argues that the "trust and confidence" the Parkers instilled in McClain did not amount to domination or control. McClain maintains that the Parkers had sole and exclusive signatory authority over all of the Companies' finances, and that they never challenged McClain's services or compensation.  Further, McClain states that the Parkers approved all day-to-day operations of the Companies, and that they

---

[9]The court recognizes that these are not all of the Parkers' allegations in support of this, and other, claims for relief.  However, the court views these allegations as the ones most likely to be asserting individual, rather than company, causes of action, and thus support a basis for recovery.

preferred professionals working for the Companies to report to Russ.  McClain states that he acted in accordance with the instructions he received from Russ, and that he did not have authority to – and did not – make decisions on behalf of the Companies.  With regard to important financial and legal decisions, McClain asserts that the Parkers were kept fully informed and that they had a team of lawyers and accountants to advise them.  Specifically with respect to the Georgia Capital loans, McClain maintains that he did not personally advise the Parkers, but rather, arranged for the Companies' corporate counsel, Jeffrey Ellinger, to do so.

McClain also contends that the interest rate swap agreement would have been successful but for the unexpected fall of interest rates, and further, that counsel for the Companies advised the Parkers of the risks and benefits of such an agreement.  McClain also states that both the interest rate swap agreement and the Georgia Capital loans were appropriate business decisions, as the Companies faced increasing difficulty obtaining financing for the apartment project due to the deteriorated lending market.  McClain also asserts that, with regard to the apartment project, TTA made oral assurances that the Companies would be allowed to purchase the land, and that any representations he made to the Parkers were consistent with what TTA had informed him.  Rather than the project failing because of the inability to obtain the TTA property, McClain contends that the apartment project failed due to the Companies' liquidity problems.

With respect to the stabilization fee, McClain states that under his direction, Seaboard Station was completed and leased to stabilization, with 92.98% being leased.  He maintains that his agreement with G&P included a provision for a stabilization fee, which was calculated by independent third party appraisers at $2,176,629.00.  Of this amount, McClain states that he received $715,000.00.  McClain asserts that Mr. Parker acknowledged his obligation to pay the remaining

amount of the stabilization fee, as evidenced by the promissory note in the amount of $1,461,629.00 and the monthly payments of $6,090.12 made by G&P.

As demonstrated by the numerous contradictory allegations set forth above, factual disputes exist surrounding the relationship between the parties that preclude summary judgment. Genuine issues of material fact exist as to the level, if any, of domination or control that McClain exercised over the Parkers individually. See Barger v. McCoy Hillard & Parks, 346 N.C. 650, 661-62, 488 S.E.2d 215, 221-22 (1997) (finding genuine issue of material fact as to whether defendant accountants owed plaintiff shareholders a special duty based on plaintiffs' allegations that defendants made representations about the corporation's financial status that caused plaintiffs to personally guarantee loans obtained by the corporation, and because defendants knew plaintiffs would be the guarantors).

Assuming the existence of a fiduciary relationship, the court must next determine whether issues of fact exist with respect to whether McClain breached any such fiduciary duty. The evidence forecasts factual disputes in several respects. There are disputed allegations as to whether McClain breached his duties by: fraudulently causing Mr. Parker to execute a promissory note for the alleged stabilization fee, which the Parkers claim was not agreed to and which they assert was improperly calculated; causing the Parkers to borrow money from Georgia Capital on outrageous terms without first taking the necessary steps to ensure that G&P – Seaboard II could acquire ownership of the TTA property; and counseling the Parkers to personally incur further financing and pledge substantially all of their personal assets as security for such loans.[10] The court thus finds there are

---

[10]There may be some allegations that only pertain to harm to the Companies, however, even in the absence thereof, there are genuine issues that are best left to be sorted out at trial.

genuine issues of material fact as to whether McClain breached any fiduciary duty owed to the Parkers. Therefore, summary judgment is denied as to the Parkers' claim for breach of fiduciary duty.

*B. Fraudulent Transfers*

The court will next consider the Parkers' claim for constructively fraudulent transfers under the North Carolina Uniform Fraudulent Transfer Act. The Parkers base this claim on payments they made to McClain totaling $318,830.00 between July 27, 2007 and August 28, 2009. McClain contends that the Parkers cannot prevail because they did not have unreasonably small assets at the time of the transfers and therefore, cannot satisfy North Carolina's fraudulent transfer statute. In response, the Parkers argue that McClain's argument improperly focuses only on one alternative prong of the fraudulent transfer statute because they can proceed if they can show satisfaction of the other prong, namely, that they were unable to pay their debts as they became due. McClain also contends that three of the alleged payments took place more than four years before the Parkers' petition date, and are thus beyond the applicable statute of limitations (the "2007 Payments").[11]

Section 544(b) of the Bankruptcy Code provides authority for the trustee to "avoid any transfer that is voidable under the Uniform Fraudulent Transfer Act, as adopted in North Carolina ('UFTA') by a creditor holding an allowed unsecured claim." Tanglewood Farms, Inc. of Elizabeth City v. Meherrin Agricultural & Chemical Co. (In re Tanglewood Farms, Inc. of Elizabeth City), Adv. Pro. No. 12-00186-8-JRL, 2013 WL 1405729, at *4 (Bankr. E.D.N.C. April 8, 2013). The Parkers rely on N.C. Gen. Stat. § 39-23.4(a)(2), which provides, in pertinent part, that:

---

[11]The payments McClain contends are outside of the statute of limitations were made on July 27, 2007, August 28, 2007 and September 18, 2007. The Parkers filed their chapter 11 petition on April 25, 2012.

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

. . . .

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

a. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; **or**

b. Intended to incur, or believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

§ 39-23.4(a) (emphasis added).  A cause of action under N.C. Gen. Stat. § 39-23.4(a)(2) must be brought within four years after the transfer at issue was made.  § 39-23.9.  The plaintiff bears the burden of establishing that a conveyance was fraudulent.  U.S. v. Greer, 383 F. Supp. 2d 861, 864 (W.D.N.C. 2005).  Section 548 of the Code similarly permits the trustee to avoid as fraudulent certain transfers within two years of the petition date.  Since all transactions at issue were more than two years prior to the petition date, the court will proceed under N.C. Gen. Stat. § 39-23.4 rather than § 548.  However, case law under § 548 has been used in interpreting and applying state fraudulent transfer statutes, and courts often find that a satisfaction of § 548 also satisfies N.C. Gen. Stat. § 39-23.4(a)(2).  See Oliver v. Cooper (In re Bateman), Adv. Pro. No. 11-00397-8-RDD, 2012 WL 3061181, at *6 (Bankr. E.D.N.C. July 26, 2012) (similar analysis between ability to repay prong of § 39-23.4(a) and insolvency requirement of § 548); Ivey v. Swofford (In re Whitley), No. 10-10426, 2012 WL 170135, at *4 (Bankr. M.D.N.C. Jan. 19, 2012) (stating that courts have looked to case law interpreting § 548 when analyzing their respective state statutes; N.C. Gen. Stat. § 39-23.4 is similar in form and substance to § 548).

Both N.C. Gen. Stat. § 39-23.4 and § 548 recognize two situations in which a fraudulent transfer action may be brought: if a transfer was made with actual fraudulent intent, or if a transfer

17

was constructively fraudulent in light of the debtor's financial stability. <u>In re Summit Place, LLC</u>, 298 B.R. 62, 73 (Bankr. W.D.N.C. 2002) (discussing 11 U.S.C. § 548(a)(1)(B)). The Parkers allege that the transfers at issue were constructively fraudulent. The first requirement of the pertinent constructive fraud provisions under N.C. Gen. Stat. § 39-23.4(a)(2) is that the debtor made the transfer without receiving reasonably equivalent value in exchange. "Reasonably equivalent value" is a question of fact to be determined in light of the facts and circumstances of the transaction. <u>Summit Place</u>, 298 B.R. at 69 (discussing § 548(a)(1)(B)). When evaluating reasonably equivalent value, the focus is on the consideration received by the debtor; a large disparity between what the debtor gave and what it received typically indicates that the exchange was not for reasonably equivalent value. <u>In re Tanglewood Farms</u>, 2013 WL 1405729, at *5. Although reasonably equivalent value may include situations where there is a satisfaction of a preexisting debt or obligation of the debtor, it does not include the satisfaction or guarantee of the debt of another. <u>Id.</u>

Upon a showing of a lack of reasonably equivalent value, the court must determine whether the transfer satisfies one of the two prongs under N.C. Gen. Stat. § 39-23.4(a)(2): (1) the transfer left the debtor with "unreasonably small" assets; **or** (2) the debtor intended to, or believed that it would, incur debts beyond its ability to repay.[12] "Asset" under N.C. Gen. Stat. § 39-23.1 means "property of the debtor," but excludes property (1) to the extent it is encumbered by a valid lien; (2) to the extent it is exempt under non-bankruptcy law; and (3) "[a]n interest in property held in tenancy by the entireties to the extent it is not subject to process by a creditor holding a claim against only one tenant." § 39-23.1(2). "Property" is anything that may be the subject of ownership. § 39-23.1(10).

---

[12]Section 548 incorporates these scenarios using very similar language, but substitutes the phrase "unreasonably small *capital*" for "unreasonably small assets." § 548(a)(B)(ii)(II) (emphasis added).

There are few North Carolina cases interpreting the "unreasonably small asset" prong of N.C. Gen. Stat. § 39-23.4(a)(2), so the court looks to cases interpreting "unreasonably small capital" under § 548.  Whether this prong is satisfied depends on whether, at the time of the transfer, the debtor was engaged in or was about to be engaged in business "for which any property remaining with the debtor was unreasonably small capital."  Summit Place, 298 B.R. at 74 (discussing § 548 and unreasonably small capital).  This has been interpreted as referring to an "inability to generate sufficient profits to sustain operations," and may be analyzed by objectively asking whether projections regarding sustained operations were reasonable.  Smith v. Litchford & Christopher, P.A. (In re Bay Vista of Va., Inc.), 428 B.R. 197, 225 (Bankr. E.D. Va. 2010) (quoting Baldi v. Samuel Son & Co. (In re McCook Metals, L.L.C.), No. 05 C 2990, 2007 WL 4287507, at *13 (N.D. Ill. Dec. 4, 2007)) (internal quotations omitted).  Whether a debtor is left with unreasonably small assets may be evidenced by the debtor's balance sheet and other appraisals of the debtor's property.  Summit Place, 298 B.R. at 74.  A "balance sheet" inquiry requires the court to determine whether the value of the debtor's assets exceeds the value of its liabilities.  Samson v. Western Capital Partners LLC (In re Blixseth), 514 B.R. 871, 881 (D. Mont. 2014), appeal docketed, No. 14-35741 (9th Cir. Sept. 3, 2014).  The test may also include examining "all reasonably anticipated sources of operating funds, which may include new equity infusions, cash from operations, or cash from secured or unsecured loans over the relevant time period."  Smith, 428 B.R. at 225 (quoting Moody v. Sec. Pac. Bus. Credit, Inc., 971 F.2d 1056, 1072 n.24 (3d Cir. 1992)) (internal quotations omitted).

On the other hand, whether a debtor has a likely inability to pay debts as they become due depends on whether the transaction leaves the debtor undercapitalized.  Oliver v. Cooper (In re Bateman), 2012 WL 1110080, at *3.  Case law interpreting debtors' inability to pay debts is less

19

common, even in cases discussing § 548.  See Yoder v. T.E.L. Leasing, Inc. (In re Suburban Motor Freight, Inc.), 124 B.R. 984, 1000 n.14 (Bankr. S.D. Ohio 1990) (stating that there are few rulings on debtors' inability to pay debts and that it is rarely used by parties, "as it appears to require the courts to undergo a subjective, rather than objective, inquiry into a party's intent.").  In the absence of a clear rule, courts have, however, made findings as to a debtor's inability to pay debts.  A balance sheet with significant equity, a loan commitment, and evidence of significant value and equity in the debtor all may indicate that the debtor is sufficiently capitalized and has the ability to repay its debts as they come due.  Whitaker v. Mortg. Miracles, Inc. (In re Summit Place, LLC), 298 B.R. 62, 74 (Bankr. W.D.N.C. 2002) (analyzing § 548).  In Whitaker, id., an appraisal of the property "belie[d] insolvency or insufficient capitalization of [the debtor] and supported [the debtor's] ability to repay its debts as they matured (either from refinancing, development or sale of the real estate)."  On the contrary, evidence that the subject of the transfer was the debtor's only significant asset may indicate that the debtor failed to retain property sufficient to repay creditors and that he intended or believed that he would incur debts beyond his ability to pay.  Bakst v. Clarkston (In re Clarkston), 387 B.R. 882, 889 (Bankr. S.D. Fla. 2008) (interpreting N.C. Gen. Stat. § 39-23.4(a)(2)).

Constructively fraudulent transfers grounded upon a debtor's inability to repay debts has an additional scienter element: the debtor must have intended to, or believed that it would, incur debts beyond its ability to repay.  § 39-23.4(a)(2)(b).  Courts have found that the intent requirement can be inferred through objective circumstances.  In Blixseth, 514 B.R. at 884, the court deemed it sufficient that the debtor could not have *reasonably* believed she would be able to pay debts as they became due.  The combination of the debtor's limited ability to generate capital, plus the fact that

the debtor's assets required extensive amounts of money to operate and maintain, indicated to the court that the debtor could not have reasonably believed she was able repay her debts. Id. In another case, the court inferred intent from the fact that the shareholders of the debtor corporation were generally aware of the debtor's financial instability, expressed serious concerns over the debtor's financial health and acknowledged that the debtor's future viability was uncertain. Yoder, 124 B.R. at 1001.

The Parkers allege that the payments to McClain between July 27, 2007 and August 28, 2009 were not in exchange for reasonably equivalent value. Assuming, *arguendo*, that the payments were not made for reasonably equivalent value, McClain contends that the Parkers cannot prevail because they did not have unreasonably small capital at the time of the transfers under N.C. Gen. Stat. § 39-23.4(a)(2)(a). In making this assertion, McClain relies on two personal financial statements executed by the Parkers and provided to financial institutions during the time period in which the transfers were made. The first personal financial statement McClain relies on is from 2008, and values the Parkers' assets at $39,473,610.00, with liabilities of $16,013,314.00. The second personal financial statement is from 2009, and values the Parkers' assets at $42,840,008.70, with liabilities of $18,889,072.00. The Parkers argue that McClain's argument focuses only on the balance sheet test regarding unreasonably small assets under N.C. Gen. Stat. § 39-23.4(a)(2)(a), whereas they can proceed, assuming proof of lack of reasonably equivalent value, if they can show they were unable to pay their debts as they became due under N.C. Gen. Stat. § 39-23.4(a)(2)(b).

As an initial matter, it appears, by virtue of the Parkers' own exhibit, that the 2007 Payments are outside of the four-year statute of limitations and are thus barred. See Ex. K, First Amended Compl., Doc. No. 27-11; § 39-23.9. In determining whether the remaining transfers were

21

constructively fraudulent, the court must first determine whether the transfers to McClain were made without receiving reasonably equivalent value in exchange. The gist of the Parkers' allegations is that McClain did not earn the amounts paid to him and wrongfully caused the payments to be made to himself, whereas McClain urges that all payments were made in accordance with his contract with G&P and were approved by the Parkers. Since neither party clearly enunciates an argument or supporting facts as to this element, the court is left only with contrasting allegations and is forced to conclude that genuine issues of material fact exist regarding whether the payments were made in exchange for reasonably equivalent value.[13]

N.C. Gen. Stat. § 39-23.4 requires that the Parkers not only show that the transfers to McClain were not for reasonably equivalent value, but must also show that they either: (1) had unreasonably small assets at the time of, or as a result of, the transfers, or (2) made the transfers intending to, or believing that they would, incur debts beyond their ability to repay. The court will first examine whether there are any genuine issues of material fact as to whether, at the time of the transfers, the Parkers had unreasonably small assets. The two personal financial statements offered by McClain show that the Parkers' assets quite substantially exceeded their liabilities during the relevant time period. The financial statements tend to belie any assertion that transfers at issue, which amounted to $318,830.00,[14] a relatively small amount in the grand scheme of the Parkers' assets, left them with unreasonably small assets. Rather, the statements show that the Parkers had assets worth more than double the amount of their liabilities. See Summit, 298 B.R. at 74 (at time of transfer in question, the debtor was in default on all of its payment obligations, had no substantial

_____

[13]The court is particularly interested in whether the payments were made in satisfaction of corporate debts owed by the Companies, or individual debts owed by the Parkers.

[14]Excluding the 2007 Payments, which are outside the statute of limitations.

cash and was at imminent risk of foreclosure, but had sufficient equity in property and thus did not have unreasonably small capital); <u>Huennekens v. Gilcom Corp. of Va. (In re SunSport, Inc.)</u>, 260 B.R. 88, 116 (Bankr. E.D. Va. 2000) (debtor had unreasonably small capital where it was left with *no* assets after the transfer was made). The court is especially confident in this conclusion when it considers the definition of "assets" under N.C. Gen. Stat. § 39-23.1, which clearly contemplates consideration of all of the debtor's property. Further, the fact that the Parkers were able to obtain loan commitments during 2008 and 2009, even in the midst of a financial crisis, indicates that they did not have unreasonably small assets at the time of, or as a result of, the transfers. Additionally, in light of the great extent of the Parkers' assets, the parties' projections of continued development efforts and success were reasonable, as they had sufficient property to pledge as collateral or sell, as needed. <u>See</u> <u>Smith v. Litchford & Christopher, P.A. (In re Bay Vista of Va., Inc.)</u>, 428 B.R. at 225. The court finds that there are no genuine issues of material fact as to whether the Parkers had unreasonably small assets, and therefore, they cannot rely on N.C. Gen. Stat. § 39-23.4(a)(2)(a) to prove their fraudulent transfer claim and can only proceed under N.C. Gen. Stat. § 39-23.4(a)(2)(b).

The court will therefore consider whether the Parkers made the transfers intending to, or believing they would, incur debts beyond their ability to repay under N.C. Gen. Stat. § 39-23.4(a)(2)(b). There is some evidence that the Parkers lacked liquidity during the relevant time period, which may have rendered them unable to repay their debts. Russ's affidavit, offered by McClain, states that the Parkers did not have the necessary cash to contribute as cash equity to obtain a Regions Bank loan for the apartment project.[15] Ex. 4, Def.'s Supp. Memo. in Support, Doc.

---

[15]Russ's affidavit states that a commitment letter from Regions Bank was obtained in October 2008, but was subsequently withdrawn.

No. 106-9 at 10.  The facts surrounding the initial Georgia Capital loan are also relevant, as they provide a glimpse into the Parkers' financial state at the pertinent time.  It is unclear whether the Parkers executed the initial Georgia Capital loan because  they were facing difficulties making payments on existing debts, or for other reasons, such as development pursuits.  See Cross Examination of Ira Morris, Ex. I to Pl. Parkers' Supp. Resp. in Opp., Doc. No. 110-5 at 24-25 (stating that Mr. Parker was unable to make the debt service payments on the Regions Bank loan in 2007 and that Mr. Parker had negative cash flow); Cross Examination of James Frederick, Ex. H to Pl. Parkers' Supp. Resp. in Opp., Doc. No. 110-4 at 76 (the purpose of the first Georgia Capital loan was to help the Parkers acquire the TTA property, not because there was a default with Regions Bank); Direct Examination of Whit Marshall, Ex. I to Pl. Parkers' Supp. Resp. in Opp., Doc. No. 110-5 at 81 (in underwriting the loan request, Georgia Capital looked to certain criteria, including the development project's negative cash flow, that the Parkers were behind on their payments with Regions Bank, and that they also had ideas to develop the site and obtain HUD financing); Cross Examination of Ira Morris, Ex. I to Pl. Parkers' Supp. Resp. in Opp., Doc. No. 110-5 at 43 (hard money loans extended by Georgia Capital in this instance involved an individual with poor cash flow, but who had property with significant value that he planned to develop to a point that he could obtain financing with a permanent lender); Direct Examination of John Castanzo, Ex. I to Pl. Parkers' Supp. Resp. in Opp., Doc. No. 110-5 at 63 (hard money loans are taken out by developers that are not creditworthy due to either having credit issues, lack of income, or projects that are not producing income).  Additionally, Mr. Parker stated in deposition that he was informed of the need to borrow money for development "to keep it afloat," and that otherwise, the project would "go under."  Ex. B to Pl. Parkers' Supp. Resp. in Opp., Doc. No. 110-2 at 11-12.

24

However, even if the Parkers had poor or negative cash flow such that they were facing difficulty making payments, this alone does not necessarily mean that they were unable to pay their debts as they became due for purposes of N.C. Gen. Stat. § 39-23.4(a)(2)(b).  As the court found in Summit, 298 B.R. at 74, equity in property supports a debtor's ability to repay its debts by allowing the debtor to refinance, develop or sell such property.  Further, the fact that the Parkers obtained a loan commitment from Regions Bank in 2008, even though it was later withdrawn, may support "a finding that [the Parkers were] not unlikely to pay debts as they became due."  Id.  However, these facts are not conclusive as to the Parkers' ability to repay under these circumstances.  The evidence also shows that the Georgia Capital loan was provided as a hard money loan, a type of loan afforded to individuals precisely because of a perceived likely inability to make payments.  Further, Regions Bank eventually withdrew its commitment letter, although the reasons for doing so are unclear.  Therefore, there at least appears to be genuine factual issues as to whether the Parkers had an ability to pay debts as they became due.

With regard to whether the Parkers possessed the requisite intent, Mr. Parker's awareness of the recurring need to borrow substantial amounts of money and the Parkers' sole control over their bank accounts could lead to an inference that they could not have reasonably believed they would be able to repay their debts.  On the contrary, Mr. Parker's professed unawareness of signing financial documents and the Parkers' ignorance of the terms of the loans is evidence that they did not have any such intent or belief.  See Ex. B to Pl. Parkers' Supp. Resp. in Opp., Doc. No. 110-2 at 30-31 (stating that he did not remember signing personal financial statements, and that he never read the personal financial statements that he signed).  The conflicting evidence as to the Parkers' intent and ability to repay precludes summary judgment on whether the Parkers made the transfers

intending to or believing that they would incur debts beyond their ability to repay under N.C. Gen. Stat. § 39-23.4(a)(2)(b). Summary judgment on the Parkers' fraudulent transfer claim under N.C. Gen. Stat. § 39-23.4(a)(2) is therefore denied. However, there is no genuine dispute as to the unreasonably small assets prong under N.C. Gen. Stat. § 39-23.4(a)(2)(a), so the Parkers may not proceed on that basis at trial.

*C. Constructive Fraud*

The Parkers contend that the allegations recounted above, and particularly the allegation that McClain used his position of trust and confidence to cause payments and benefits to himself to the detriment of the Parkers, also support a claim against McClain for constructive fraud. McClain maintains that the Parkers cannot establish a claim because there was no confidential relationship, and further, because he kept the Parkers fully informed and did not make any misrepresentations.

To establish a claim for constructive fraud, the plaintiff must show that it and the defendant stood in a "relation of trust and confidence . . . [which] led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of the plaintiff." Barger v. McCoy Hillard & Parks, 346 N.C. 650, 666, 488 S.E.2d 215, 224 (1997) (quoting Rhodes v. Jones, 232 N.C. 547, 61 S.E.2d 725, 726 (1950)) (internal quotations omitted). Constructive fraud differs from actual fraud in that it is founded on the existence of a confidential relationship rather than a specific misrepresentation. Barger, 346 N.C. at 666, 61 S.E.2d at 224. Implicit in the required showing is that the defendant sought to benefit himself. Id.

For the reasons described in the preceding discussions, the court finds that summary judgment is improper because there are genuine issues of material fact both as to whether McClain intended to benefit himself to the Parkers' detriment and as to whether there was a relationship of

26

trust and confidence.  It is apparent to the court that there are issues as to whether McClain sought to benefit himself by virtue of the Parkers' allegations that, among other things, McClain received various unauthorized commissions and checks for which he was not entitled, that he caused Mr. Parker to execute a promissory note to ensure payment of a stabilization fee to which he was not entitled, and that he counseled the Parkers to enter into risky and unfavorable loan transactions from which he derived a financial benefit.  Additionally, as set out in the breach of fiduciary duty section, there are factual issues as to the existence of a fiduciary relationship, and those same issues exist as to whether there was a relationship of trust and confidence for constructive fraud purposes. Therefore, summary judgment is denied as to the Parkers' claim for constructive fraud.

*D. Fraud*

The Parkers contend that the allegations outlined above support a claim for fraud.  McClain argues that no such claim can stand because he kept the Parkers fully informed and did not make any misrepresentations.

Generally, fraud under North Carolina law encompasses "all acts, omissions, and concealments involving a breach of legal or equitable duty and resulting in damage to another, or the taking of undue or unconscientious advantage of another."  Vail v. Vail, 233 N.C. 109, 113, 63 S.E.2d 202, 205 (1951) (quoting 37 C.J.S., Fraud, at 204) (internal quotations omitted).  A *prima facie* case for fraud consists of five elements: (1) a false representation or concealment of a material fact; (2) reasonably calculated to deceive; (3) made with intent to deceive; (4) that actually deceives; and (5) results in injury to the deceived party.  Vail, 233 N.C. at 113, 63 S.E.2d at 205 (quoting Ward v. Heath, 222 N.C. 470, 24 S.E.2d 5, 7 (1943)).

Courts in North Carolina have held that the existence of a confidential or fiduciary relationship creates a duty to fully disclose material facts, breach of which constitutes fraud and obviates the need to prove reasonable reliance.  Vail, 233 N.C. at 114, 24 S.E.2d at 206 (citing 37 C.J.S., Fraud, p. 247); see also Everts v. Parkinson, 147 N.C. App. 315, 325, 555 S.E.2d 667, 674 (2001).  In the context of confidential or fiduciary relationships, the deceived principal's failure to exercise diligence may be excused, as the duty to investigate is subordinate to the agent's duty of full disclosure.  Vail, 233 N.C. at 116-17, 24 S.E.2d at 207-08; see also Everts, 147 N.C. App. at 325, 555 S.E.2d at 674 (plaintiff need not prove reasonable reliance upon proving breach of duty to disclose, as the elements are virtually identical to what is already required to establish the very duty to disclose); Johnson v. Owens, 263 N.C. 754, 757, 140 S.E.2d 311, 313 (1965) (courts will not protect perpetrator of fraud when victim did not pursue inquiry that would have revealed the falsehood where the victim had faith in perpetrator's word).  As such, when the asserted fraud constitutes concealment or a breach of the duty to disclose, the injured party must simply establish a duty to disclose in lieu of proving reasonable reliance.  Comer v. Pers. Auto Sales, Inc., 368 F. Supp. 2d 478, 486 (M.D.N.C. 2005) (must prove reasonable reliance when alleged fraud is based on a false representation, and must only prove duty to disclose when alleged fraud is based on a failure to disclose).  Outside the context of confidential and fiduciary relationships, a duty to disclose also arises when material facts are only available to one party, and that party is aware that such facts are not within the reach of diligent attention, observation and judgment of the deceived party.  Id.

The court finds that there are clearly genuine issues of material fact regarding the occurrence of a false representation or material concealment, as the circumstances surrounding the transactions

and the parties' interactions are disputed.  The following factual disputes are especially pertinent to a resolution of this claim: whether McClain falsely represented that TTA was "on board" with the development of the apartment site; whether McClain obtained a promissory note from Mr. Parker by representing it as a means to secure McClain's 25 percent ownership interest in the seaboard apartment site when in actuality it constituted a promise to pay the stabilization fee; and whether McClain claimed entitlement to a stabilization fee when not all conditions precedent had been satisfied.  There are also contrasting allegations and evidence, and therefore genuine issues of fact, as to whether McClain acted with the intent to deceive or acted with a legitimate business purpose. With regard to whether the Parkers reasonably relied and/or whether McClain breached a duty to disclose, the court also finds that genuine factual issues are present.  The court's earlier determination that issues exist as to whether McClain owed and breached fiduciary duties to the Parkers shows that there are similar issues as to whether McClain breached a duty to disclose in the context of the Parkers' fraud claim.  There are also genuine issues of fact as to the Parkers' reasonable reliance in light of their insistence that they lacked any business or financial acumen and relied on McClain for virtually all business decisions because McClain represented that he had a great deal of expertise.  The Parkers have alleged, and it is affirmed by the statements of hired professionals, that they relied on McClain to find loans, and executed guaranties and pledged their personal property upon his advice.  Last, there are disputes regarding whether the Parkers suffered injury in their individual or corporate capacity as a result of the alleged misrepresentations and concealments.  Therefore, McClain's motion for summary judgment is denied as to the fraud claim.

*E. Negligent Misrepresentation*

The Parkers contend that the allegations supporting their other causes of action also support a claim for negligent misrepresentation. McClain maintains that the Parkers are not entitled to relief because he did not make any misrepresentations or omissions.

Negligent misrepresentation occurs when, "in the course of a business or other transaction in which an individual has a pecuniary interest, he or she supplies false information for the guidance of others in a business transaction, without exercising reasonable care in obtaining or communicating the information." Fulton v. Vickery, 73 N.C. App. 382, 388, 326 S.E.2d 354, 358 (1985). This cause of action boils down to four elements: (1) justifiable reliance by a party; (2) to its detriment; (3) on information prepared without reasonable care; (4) by one who owed the relying party a duty of care. Brinkman v. Barrett Kays & Assocs., P.A., 155 N.C. App. 738, 742, 575 S.E.2d 40, 43-44 (2003). Further, liability is limited to loss suffered:

> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
> (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Id. at 741, 575 S.E.2d at 43 (quoting Restatement (Second) of Torts § 552 (1977)). North Carolina courts have stated that summary judgment is rarely proper on a negligent misrepresentation claim, as liability is "highly fact-dependent" and the question of whether a duty is owed is of "paramount importance." Brinkman, 155 N.C. App. at 740, 575 S.E.2d at 42 (quoting Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP, 350 N.C. 214, 220, 513 S.E.2d 320, 325 (1999)) (internal quotations omitted).

For the same reasons enumerated in the fraud discussion above, the court finds that there are genuine issues of material fact as to the Parkers' negligent misrepresentation claim. The elements common to both causes of action need not be reiterated. As to intent, since negligence involves a lower standard than fraud, ruling as a matter of law is improper in light of the court's finding that there are factual issues regarding McClain's fraudulent intent. "The general rule is that, if there be any evidence tending to prove the fact in issue, or which reasonably conduces to its conclusion as a fairly logical and legitimate deduction, and not merely such as raises a suspicion or conjecture in regard to it, the case should be submitted to the jury." Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP, 350 N.C. 214, 224, 513 S.E.2d 320, 327 (1999) (quoting Jenrette Transport Co. v. Atlantic Fire Ins. Co., 236 N.C. 534, 540, 73 S.E.2d 481, 486 (1952)) (internal quotations omitted). Therefore, summary judgment on the claim for negligent misrepresentation is denied.

*F. Negligence*

The Parkers' maintain that their allegations support an action for negligence, however, McClain argues that the Parkers cannot forecast a *prima facie* case because he did not owe them any duty. McClain contends that even if he did owe a duty to the Parkers, he fully complied by keeping Russ and the Parkers apprised of material information and acting in their best interests. Further, McClain maintains that he cannot be held liable because the Parkers had a team of professionals that advised them on pertinent matters. Finally, McClain asserts that the Parkers were contributorily negligent by knowingly participating in all of the alleged actions despite being fully informed of the risks and circumstances.

Under North Carolina law, the essential elements of a negligence cause of action are the existence of a legal duty or standard of care, breach of that duty, and an injury proximately caused

31

by the breach. <u>Stein v. Asheville City Bd. of Educ.</u>, 360 N.C. 321, 328, 626 S.E.2d 263, 267 (2006);

<u>Harris v. Daimler Chrysler Corp.</u>, 180 N.C. App. 551, 555, 638 S.E.2d 260, 265 (2006) (quoting

<u>Peace River Electric Coop. v. Ward Transformer Co.</u>, 116 N.C. App. 493, 511, 449 S.E.2d 202, 214

(1994)). The law imposes a positive duty to exercise ordinary care to protect others from harm, and

violation of that duty is negligence. <u>Council v. Dickerson's, Inc.</u>, 233 N.C. 472, 474, 64 S.E.2d 551,

553 (1951).

For the same reasons as set forth in the breach of fiduciary duty discussion, there are genuine

issues of material fact as to the elements of duty and breach. Factual disputes also exist as to

contributory negligence, proximate cause and damages. The Parkers contest McClain's bases for

his argument that they were contributorily negligent, stating that they were hardly ever consulted

on company matters, were given documents to sign without any explanation as to what they were

or were simply assured by McClain that they were necessary for the project without being given

time to read the documents, and relied on McClain entirely in making decisions. As such, there are

factual issues regarding contributory negligence, and thus, proximate cause. The discussion above

and below also shows that there are factual issues regarding damages. McClain's motion for

summary judgment as to the Parkers' negligence claim is similarly denied.

*G. Conversion*

The Parkers allege that McClain converted payments from the Parkers in the amount of at

least \$333,830.00[16] between July 2007 and August 2009. McClain contends that the Parkers cannot

establish a claim for conversion because they authorized all of the payments in question. In

---

[16]These are the same payments that are the subject of the Parkers' fraudulent transfers
action.

response, the Parkers assert that a cause of action for conversion exists even if the defendant comes into lawful possession if the defendant later refuses a lawful demand for return.

Conversion is "the unauthorized assumption and exercise of the right of ownership over the goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of the owner's rights." Brown ex rel. White v. White, 76 N.C. App. 127, 129, 331 S.E.2d 703, 704 (quoting Spinks v. Taylor, 303 N.C. 256, 264, 278 S.E.2d 501, 506 (1981)) (internal quotations omitted). There are two essential elements to a claim for conversion: (1) ownership in the plaintiff, and (2) wrongful conversion by the defendant. Gallimore v. Sink, 27 N.C. App. 65, 67, 218 S.E.2d 181, 183 (1975). A wrongful conversion may occur by fraudulent means. Am. Express Fin. Advisors, Inc. v. Yantis, 358 F. Supp. 2d 818, 833 (N.D. Iowa 2005); Restatement (Second) of Torts §§ 221, 252A. A claim for conversion accrues, and the statute of limitations begins to run, when the unauthorized conversion occurs, not when the plaintiff discovers it. Stratton v. Royal Bank of Canada, 211 N.C. App. 78, 83, 712 S.E.2d 221, 227 (2011); see also First Investors Corp. v. Citizens Bank, Inc., 757 F. Supp. 687, 691 (statute of limitations for conversion is not subject to the discovery rule). However, when the defendant initially obtains possession or control lawfully, and only later exercises unauthorized dominion or control, demand and refusal become essential elements of the claim. Id.

The court finds that the Parkers' claim for conversion is dependent upon the claim for fraud. In light of the fact that the payments were authorized, the Parkers can only meet the requisite element of a wrongful conversion by proving that McClain obtained the payments through fraudulent means. If they can show that McClain obtained the payments through fraud, McClain would not have had lawful possession. Thus, a demand and refusal would neither have been

necessary nor would it have triggered the statute of limitations clock, as contended by the Parkers. However, even if the Parkers can show that the payments were obtained by fraud, all but two fall outside of the three-year statute of limitations, as they were made more than three years prior to the petition date, and thus cannot serve as a basis for this claim.  Ex. K, First Amended Compl., Doc. No. 27-11.

The only two payments falling within the statute of limitations were made on August 28, 2009 and total $18,830.00. [17] Id.  As to these two payments, there are genuine issues of material fact as to whether they were obtained by fraud, as enumerated in the fraud discussion above. Additionally, neither party clearly delineated what debt or obligation these payments satisfied, adding further muddiness and making it impossible for the court to render a determination.  See Gadson v. Toney, 69 N.C. App. 244, 246, 316 S.E.2d 320, 322 (1984) (summary judgment improper where the evidence raises genuine issues as to whether the defendant's possession of plaintiff's property was authorized or wrongful).  However, the court cautions that it finds this claim for relief tenuous at best, and that the Parkers' other causes of action more adequately state a basis for recovery.  Summary judgment on the claim for conversion is therefore denied as to the payments falling within the statute of limitations totaling $18,830.00, but allowed as to the remaining payments unless the Parkers can show that the $250,000.00 payment fell within the statute of limitations.

---

[17]To the extent that the Parkers can show that the $250,000.00 paid to McClain as part of his development fee for the apartment site was within the statute of limitations, this amount may also be at issue.  However, while the Parkers' evidence states that this was paid sometime in 2009, the exact date is listed as "unknown."  Ex. K, First Amended Compl., Doc. No. 27-11.

*H. Unfair or Deceptive Trade Practices*

The Parkers maintain that allegations in support of their other causes of action support a claim for unfair or deceptive trade practices.  However, McClain argues that summary judgment should be granted in his favor on this claim because he did not engage in any wrongful conduct or make deceptive representations, and further, did not proximately cause any damages to the Parkers.

Pursuant to N.C. Gen. Stat. § 75-1.1, "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." § 75-1.1(a).  "'[C]ommerce' includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession." § 75-1.1(b).  To establish a *prima facie* case, the plaintiff must prove that: (1) the defendant committed an unfair or deceptive act or practice; (2) the act was in or affecting commerce; and (3) the act proximately caused injury to the plaintiff.  Canady v. Mann, 107 N.C. App. 252, 260, 419 S.E.2d 597, 602 (1992) (citing Spartan Leasing Inc. v. Pollard, 101 N.C. App. 450, 460, 400 S.E.2d 476, 480 (1991)).  The "business activities" contemplated by the statute include "the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized."  HAJMM Co. v. House of Raeford Farms, Inc., 328 N.C. 578, 594, 403 S.E.2d 483, 493 (1991).

Proof of fraud is sufficient to establish a violation of the statute.  Canady at 260, 419 S.E.2d at 602 (citing Hardy v. Toler, 288 N.C. 303, 309, 218 S.E.2d 342, 346 (1975)).  Otherwise, conduct is unfair or deceptive if it has the capacity or tendency to deceive.  Canady at 260, 419 S.E.2d at 602.  "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers."  Opsahl v.

35

Pinehurst Inc., 81 N.C. App. 56, 69, 344 S.E.2d 68, 76 (1986) (quoting Johnson v. Phoenix Mut.

Life Ins. Co., 300 N.C. 247, 263, 266 S.E.2d 610, 621 (1980)) (internal quotations omitted).

Specifically, conduct is unfair when it "amounts to an inequitable assertion of [] power or position,"

id. (quoting Johnson at 264, 266 S.E.2d 622)) (internal quotations omitted), or when an actor uses

coercive tactics, Wilder v. Squires, 68 N.C. App. 310, 315, 315 S.E.2d 63, 66 (1984)). To determine

whether a practice is unfair or deceptive, the court must look to the facts surrounding the transaction

as well as the impact on the marketplace. Opsahl, 81 N.C. App. at 68, 344 S.E.2d at 76.

In light of the court's findings that genuine issues of material fact exist with regard to the

Parkers' other causes of action, summary judgment is also inappropriate as to the Parkers' claim for

unfair or deceptive trade practices. This cause of action shares underlying factual disputes with the

other claims that prevent a ruling as a matter of law as to whether McClain engaged in conduct that

amounted to an inequitable assertion of his position over the Parkers. See Powell v. Wold, 88 N.C.

App. 61, 68, 362 S.E.2d 796, 800 (1987) (court denied motion to dismiss as to plaintiff's unfair or

deceptive trade practices claim in light of denial of motion to dismiss as to plaintiff's fraud and

negligent misrepresentation claims). As such, summary judgment on the claim for unfair or

deceptive trade practices is denied.

*I. Remaining Claims*

Finally, McClain seeks summary judgment on the Parkers' remaining causes of action:

disallowance of claim, setoff, and equitable subordination. As these claims are necessarily

dependent on the Parkers' other causes of action, for reasons set forth previously, summary

judgment is inappropriate on these claims.

## CONCLUSION

In conclusion, the court finds that genuine issues of material fact exist as to the Parkers'
claims for breach of fiduciary duty, constructive fraud, fraud, negligent misrepresentation,
negligence, conversion,[18] unfair or deceptive trade practices, disallowance of claim, setoff and
equitable subordination.  Summary judgment is denied as to these claims.  Genuine issues of
material fact likewise exist as to the Parkers' claim for fraudulent transfers,[19] and with the exception
of the 2007 transfers that are barred by the statute of limitations, summary judgment is denied on
this claim.  Summary judgment is granted to McClain with respect to the Parkers' fraudulent
transfers claim arising out of the 2007 Payments and with respect to the conversion claim arising
out of the payments beyond the statute of limitations.

## END OF DOCUMENT

---

[18]Except for the payments barred by the statute of limitations, as set forth above.

[19]The court concluded that there were no genuine issues of material fact as to whether the
Parkers had unreasonably small assets, and therefore, they cannot rely on N.C. Gen. Stat. § 39-
23.4(a)(2)(a) to prove their claim of constructive fraud and must instead rely on N.C. Gen. Stat.
§ 39-23.4(a)(2)(b).