**SO ORDERED.**

**SIGNED this 18 day of May, 2017.**

*Stephani W. Humrickhouse*

**Stephani W. Humrickhouse**
**United States Bankruptcy Judge**

---

## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF NORTH CAROLINA
### RALEIGH DIVISION

IN RE:

**WILLIAM D. PARKER, JR. and**　　　　　　　　**CASE NO. 12-03128-8-SWH**
**DIANA LYNNE PARKER,**

　　　　**DEBTORS**


**WILLIAM D. PARKER, JR. and**
**DIANA LYNNE PARKER,**

　　　　　　　　　　　　　　　　　**ADVERSARY PROCEEDING**
　　　**Plaintiffs**　　　　　　　　　　**NO.  13-00055-8-SWH-AP**

　　　**v.**

**CONAN R. MCCLAIN,**

　　　**Defendant**


### MEMORANDUM OPINION REGARDING
### ORDER ALLOWING IN PART AND DENYING IN PART DEFENDANT'S MOTION
### FOR JUDGMENT ON PARTIAL FINDINGS UNDER RULE 52(c)

On March 30, 2017, the court entered an order allowing in part and denying in part defendant

Conan McClain's ("McClain") motion for judgment on partial findings, which McClain made at the

conclusion of plaintiffs' case-in-chief during a bench trial conducted in Raleigh, North Carolina.

McClain sought judgment on partial findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, made applicable here by Rule 7052 of the Federal Rules of Bankruptcy Procedure. Rule 52(c) provides that "if a party has been fully heard on an issue in a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." The court allowed the motion and entered judgment on partial findings for McClain with respect to the first through eighth, tenth, and eleventh causes of action in plaintiffs' First Amended Complaint. The motion was denied with respect to the ninth claim ("Disallowance of Claim"), which will be resolved within the context of plaintiffs' objections to claims. The court's findings of fact and conclusions of law are set forth below.

## BACKGROUND AND STIPULATED FACTS

Plaintiffs William Parker, Jr. (now deceased) and Diana Lynne Parker (collectively, "the Parkers") are the plaintiffs in this adversary proceeding[1] and the debtors in the main bankruptcy case.[2] The Parkers own various tracts of real property in North Carolina and, prior to filing for bankruptcy, had engaged in the business of developing real estate in and around Raleigh. The Parkers operated their business through two companies in which they are the primary shareholders and officers, Gregory & Parker, Inc. ("G&P"), and Gregory & Parker – Seaboard, LLC (collectively,

---

[1]This overview of the uncontested facts originally was set forth in the court's Order Regarding Summary Judgment ("SJ Order") (DE #104), entered on August 10, 2015. It is set out again here in an expanded form that incorporates relevant stipulated facts identified by the parties in the First Amended Final Pretrial Order (DE #184), entered on August 1, 2016; also included are citations to plaintiffs' admitted exhibits, where helpful and appropriate. The court also recites procedural developments occurring subsequent to entry of the SJ Order.

[2]Mr. Parker's failing health was known to the parties, and the court was informed in early 2015 that Mr. Parker had passed away. The court subsequently deemed it to be possible, and in the best interest of the parties, for Mr. Parker's case to proceed. Fed. R. Bankr. P. 1016.

"the Companies").  Particularly relevant to this action is the Companies' ownership of real estate located near downtown Raleigh, referred to here as Seaboard Station.   Mr. Parker acquired G&P and real property including Seaboard Station in 1990, when he inherited it upon the death of his father.

In or around 1999, Mr. Parker hired William "W.A." Russ ("Russ") to manage Seaboard Station, but the Parkers retained decision making authority and control over the G&P bank accounts. A decision was made to engage in a redevelopment project at Seaboard Station and, in August 2004, Gregory & Parker – Seaboard, LLC ("G&P Seaboard") was formed.  In November 2004, G&P Seaboard entered into a Development and Services Agreement (the "Development Contract") with Trammel Crow Company ("Trammel Crow").   McClain was at that time a vice-president of Trammel Crow and was, in that capacity, involved in the efforts to redevelop Seaboard Station. Also in November 2004, G&P Seaboard closed a loan with Regions Bank.

On November 16, 2005, G&P Seaboard's corporate counsel Jordan Price Wall Gray Jones & Carlton, PLLC ("Jordan Price") sent to Trammel Crow written notification of various events constituting default under the Development Contract.  The notice was signed by attorney Jeffrey R. Ellinger ("Ellinger"), addressed to McClain in his capacity as vice president, and cc'd to Russ.  It identified and demanded correction of the events of default, which included the failure of Trammel Crow (through its employee Bob Mitchell) to adequately perform its obligations with respect to leasing, its failure to meet construction deadlines, and its generally subpar supervision of the development project.   Ellinger's letter also cited Mitchell's failure to make progress with "discussions with the Triangle Transit Authority regarding a lease or purchase of real property related to development of Phase II of Seaboard Station," as to which "[a]bsolutely] nothing has

3

happened with regard to that issue involving TTA for at least nine (9) months that I'm aware of."
Plaintiffs' Ex. 19.   In December 2005, McClain resigned from Trammel Crow.  In February 2006,
G&P Seaboard terminated the Development Contract with Trammel Crow due to ongoing
dissatisfaction with its performance.

Thereafter, McClain was retained by G&P in his individual capacity to continue with
redevelopment efforts at Seaboard Station.[3]   McClain was, at all times relevant to this action,
licensed as a real estate broker by the North Carolina Real Estate Commission.  McClain mainly
reported to Russ, who was primarily responsible for reporting to the Parkers at their home in
Johnston County, but McClain sometimes reported directly to the Parkers at their home.  At all times
relevant to this action, the Parkers did not have an office on-site at Seaboard Station and did not use
email.   Also at all times relevant to this action, Mr. Parker was president and sole shareholder of
G&P, Mr. Parker and/or G&P were managers of G&P Seaboard, and Mrs. Parker was secretary of
G&P with the sole authority to write checks.

During his involvement with the Seaboard Station project, McClain helped pursue lease
agreements and also facilitated loans to the Companies and the Parkers.  In exchange, McClain
received paychecks from G&P, was paid commissions with respect to certain leases entered into
between the Companies and Seaboard Station tenants, and was paid sums out of loan proceeds.[4]

---

[3]The parties disagreed on whether there was ever a written, fully-executed agreement
between G&P and McClain for McClain to serve as developer or broker at Seaboard Station.  As
is discussed later in this memorandum opinion, McClain testified that he provided services
pursuant to a slip-sheeted version of the Development Contract, and plaintiffs' witness Ellinger
testified that he saw an unexecuted copy of such an agreement.

[4]The legitimacy of and authority for these payments was disputed.

4

McClain also received payments, the propriety of which is in dispute, in accordance with a stabilization fee to be paid once Seaboard Station reached 75 percent occupancy.[5]

In March 2006, tenant McClain and Bold, Inc. ("M&B") – no relation to Conan McClain – entered a lease with G&P Seaboard for a space in which to operate a grocery store, Capital City Grocery. The City of Raleigh extended a loan in the amount of $300,000 to G&P Seaboard for upfits on the space, secured by a lien on the property. The grocery failed under M&B's ownership, closed in April 2007, and defaulted on the lease. On May 24, 2007, McClain and two partners formed Capital City Grocery, Inc.. The M&B lease was assigned to the new organization, which occupied the space and resumed operation of the grocery store. G&P and/or G&P Seaboard repaid the $300,000 loan to the City of Raleigh. During this time Capital City Grocery, Inc. was managed by McClain and his two partners, and on some occasions failed to pay rent as due under its lease.

In 2008, a new entity, Gregory & Parker – Seaboard II, LLC ("G&P Seaboard II"), was formed for the purpose of developing an apartment site at Seaboard Station. McClain was retained to provide development services related to the apartment project, and entered into a contract with G&P Seaboard II for such services. The apartment project's feasibility was dependent on G&P Seaboard II obtaining ownership or control of a portion of contiguous property owned and/or controlled by the Triangle Transit Authority ("TTA"). McClain proceeded with efforts to develop the apartments, including assisting with the procurement of loans. On October 24, 2008, Regions

---

[5]Addressed later in this opinion is the court's conclusion that plaintiffs failed to establish that McClain owed, to them, a fiduciary or other special duty sufficient to support the claims asserted in the First Amended Complaint. Therefore, there is no predicate at this time for the court's consideration of plaintiff's assertions regarding the stabilization fee and occupancy calculation; those issues do, however, pertain to the validity and amount of McClain's claim based on the Promissory Note, and will be fully considered in that context.

Bank issued a loan commitment letter to finance the apartment project, which Mr. Parker signed on behalf of G&P Seaboard II.  On October 27, 2008, McClain and G&P Seaboard II executed a development and services agreement relating to the Seaboard apartment project ("apartment project").

On or about February 27, 2009, Mr. Parker executed a Promissory Note in the principal amount of $2,550,000 for the benefit of Georgia Capital; on October 14, 2010, he executed a second Promissory Note for the benefit of Georgia Capital, in the amount of $1,461,629.  The U.S. Department of Housing and Urban Development ("HUD") issued a Commitment for Insurance for Advances to G&P Seaboard II on November 22, 2010, and on December 6, 2010, Greystone Servicing Corporation, Inc. issued a commitment letter to fund a mortgage loan for the apartment project to be insured by HUD.  A contract between G&P Seaboard II and CF Evans & Co. Construction Services, LLC ("CF Evans") was executed in February 2011, after which CF Evans demolished and removed an existing structure located on the property on which the Seaboard apartments were to be built.  CF Evans was not paid for part of this work, and in an effort to resolve its claims, Mr. Parker executed, in his individual capacity, a promissory note and confession of judgment in favor of CF Evans.  Ultimately, however, G&P Seaboard II did not acquire use of the TTA property, and the apartment project failed.[6]

## PROCEDURAL POSTURE

On February 22, 2012, the Companies filed chapter 11 petitions, which later were consolidated and converted to chapter 7.  On April 25, 2012, the Parkers filed a chapter 11 petition

---

[6]As noted earlier, the foregoing factual account sets out uncontested facts as agreed by the parties.  The court's additional findings of fact based on the Parkers' presentation of evidence are discussed below, together with the legal conclusions derived from them.

6

in bankruptcy.  On March 25, 2013,[7] the Companies, through the Parkers, filed suit against McClain alleging fourteen causes of action: preferential transfers; fraudulent transfers; breach of fiduciary duty; constructive fraud; fraud; negligent misrepresentation; negligence; breach of contract; collection on guaranty; conversion; unfair or deceptive trade practices; disallowance of claim; setoff; and equitable subordination (the "Companies' Adversary Proceeding").  The Companies' Adversary Proceeding was resolved by order dated June 11, 2014, which approved a settlement and compromise among the parties.  *Gregory & Parker, Inc. v. McClain (In re Gregory & Parker, Inc.)*, Adv. Pro. No. 13-00052-8-SWH (Bankr. E.D.N.C. June 11, 2014).   On September 17, 2012, McClain initiated an adversary proceeding objecting to the Parkers' discharge under 11 U.S.C. §§ 727(a)(4)(A) and (a)(2), arguing that the Parkers made knowing and intentional omissions and misrepresentations regarding the nature of their personal property, and that Mr. Parker fraudulently transferred his personal property from his business office to his personal residence.   On cross-motions for summary judgment, the court found no genuine issues of material fact as to these allegations, and granted summary judgment for the Parkers in an order entered on May 22, 2015. (Adv. Pro. No. 12-00238-8-SWH-AP, DE # 75.)  That proceeding was closed on June 10, 2015.

The Parkers as individuals initiated the present adversary proceeding against McClain on March 27, 2013,[8] asserting eleven causes of action: fraudulent transfers under the North Carolina Uniform Fraudulent Transfer Act; breach of fiduciary duty; constructive fraud; fraud; negligent misrepresentation; negligence; conversion; unfair or deceptive trade practices; disallowance of claim; setoff; and equitable subordination.  On November 12, 2014, McClain filed a motion for

---

[7]A First Amended Complaint in the Companies' Adversary Proceeding was filed on July 8, 2013.

[8]The First Amended Complaint in this proceeding also was filed on July 8, 2013.

7

summary judgment as to all of the Parkers' claims. McClain asserted in his motion that the Parkers lacked standing to assert their claims against him because the asserted claims actually belonged to the Companies, and the Parkers did not allege any unique, distinct harm to them personally. The court held that it could not conclude, as a matter of law, that the Parkers lacked standing as to all of their claims because genuine issues of material fact existed with respect to the existence and extent of harm *unique and personal to the Parkers* resulting from McClain's allegedly wrongful conduct. The court denied McClain's motion for summary judgment to the extent the motion was based on the affirmative defenses of *res judicata* and judicial estoppel.

Regarding the substantive bases asserted by McClain in support of summary judgment, the court allowed the motion in part with respect to certain of the Parkers' claims that were precluded by the applicable statute of limitations. The court otherwise denied the motion after discussing, at great length, the extent to which the parties disputed certain facts that were essential to plaintiffs' claims. The court conducted a bench trial which took place in Raleigh, North Carolina over thirteen non-consecutive days. At the conclusion of plaintiffs' case-in-chief, McClain moved for judgment on partial findings. Plaintiffs objected to the motion, after which both sides submitted detailed and comprehensive memoranda responsive to the court's request that they outline the key elements of their arguments and specifically note the evidence in support of them. On March 30, 2017, the court entered an order allowing McClain's motion in part and denying in part, as well a judgment for McClain with respect to ten of the eleven counts. That order provided for the subsequent entry of an opinion setting out the court's findings of fact and conclusions of law, and those facts and conclusions are set out below.

## DISCUSSION

Bankruptcy Rule 7052 applies in this adversary proceeding and incorporates Rule 52 of the Federal Rules of Civil Procedure, which provides, in relevant part, as follows:

> Judgment on Partial Findings: If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.  The court may, however, decline to render any judgment until the close of the evidence.  A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

Fed. R. Civ. P. 52(c); *see In re Modanlo*, 413 B.R. 262, 265 (Bankr. Md. 2009) (discussing application of Fed. R. Civ. P. 52(c)).  Under Rule 52(a), the court must "find the facts specially and state its conclusions of law separately."  Fed. R. Civ. P. 52(a).

Motions for a ruling under Rule 52(c) recently were discussed in *In re Myrtle*, 2013 WL 6670548 (Bankr. W.D. Va. 2013), wherein that court held that "in considering such a motion, the Court is to assess and weigh the evidence presented and render judgment if the evidence is insufficient to support the claim or defense." *Id.* *2 (citations omitted).  The court is to draw no special inferences: "[R]ather, the Court 'is to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies.'" *Id.*, *quoting Cherrey v. Thompson Steel Co.*, 805 F. Supp. 1257, 1261 (D. Md. 1992) (quoting 9 C. Wright and A. Miller, *Federal Practice and Procedure* § 2371 (1971)).  After assessing and evaluating the evidence presented, the court "may render judgment if the evidence is insufficient to support a claim or defense." *Modanlo*, 413 B.R. at 265-66 (citing *Carter v. Ball*, 33 F.3d 450 (4th Cir. 1994)).

## I.        Standing to Sue and Existence of Fiduciary Duty

As an initial matter, McClain renews his contention that the claims asserted by the Parkers in fact belong to the Companies, such that the Parkers lack standing to assert these claims against him.  The Parkers' claims survived McClain's motion for summary judgment on this issue because, as discussed in the SJ Order, there were genuine disputes of material fact as to whether the Parkers could satisfy either of the two exceptions applicable to this general rule: "[G]uarantors of corporations generally may not bring individual actions to recover what they consider their share of the damages suffered by the corporation."  *Barger v. McCoy Hillard & Parks*, 488 S.E.2d 215, 220-21 (N.C. 1997).  The exceptions provide that a guarantor "may bring an individual action against a third party *for breach of fiduciary duty*, when (1) 'the wrongdoer owed them a special duty' or (2) they suffered a personal injury 'distinct from the injury sustained by ... the corporation itself.'"  *Id.* at 219, 221 (emphasis added).

Thus, whether the Parkers have standing to assert the majority of their claims rested squarely on their ability to put forward evidence sufficient to permit the trier of fact to conclude that either exception – the "special duty," or the "personal injury" – applies, such that the court's consideration of the standing issue largely overlaps with the factual foundation and legal analysis applicable to plaintiffs' assertion of a fiduciary duty owed by McClain to the Parkers.  The court turns now to that analysis.

### A.        Required Elements to show Existence and Breach of Fiduciary Duty in Law or in Fact

As recounted in the SJ Order, it is fundamental that for a fiduciary duty to exist, there must first be a fiduciary relationship.  *Dalton v. Camp*, 548 S.E.2d 704, 707 (N.C. 2001).  Specifically:

A fiduciary relationship exists where "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Id.* (quoting *Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931)) (internal quotations omitted). "Only when one party figuratively holds all the cards – all the financial power or technical information, for example – have North Carolina courts found that the special circumstance of fiduciary relationship has arisen." *SNR Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 613, 659 S.E.2d 442, 451 (2008) (quoting *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 348 (4th Cir. 1998)) (internal quotations omitted). There are two types of fiduciary relationships recognized in North Carolina: (1) those arising from certain legal relationships, such as attorney and client or broker and client, and (2) those existing "in fact" due to "confidence reposed on one side, and [] resulting superiority and influence on the other." *Danube Partners 141, LLC*, 189 N.C. at 613, 659 S.E.2d at 451 (quoting *Rhone-Poulenc Agro S.A. v. Monsanto Co.*, 73 F. Supp. 2d 540, 546 (M.D.N.C. 1999)) (internal quotations omitted).

There is no distinct definition for a fiduciary relationship in fact; whether such a relationship exists depends on the facts and circumstances in each case. *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 588, 403 S.E.2d 489 (1991). Courts have found that the existence of superior knowledge, trust and inexperience are insufficient to establish a fiduciary relationship. *See Eastover Ridge, LLC v. Metric Constructors, Inc.*, 139 N.C. App. 360, 533 S.E.2d 827 (2000) (superior knowledge insufficient); *see also River's Edge Pharm., LLC v. Gorbec Pharm. Servs., Inc.*, No. 1:10CV991, 2012 WL 1439133 (M.D.N.C. April 25, 2012) (trust and inexperience alone insufficient). Rather, for a fiduciary relationship to arise in fact, there must be "control and domination." *Rhone-Poulenc Agro S.A. v. Monsanto Co.*, 73 F. Supp. 2d at 546. Relevant factors for determining the existence of a fiduciary relationship may include: "the degree of kinship between the parties, the disparity in age, health, mental condition and education and business experience between the parties; and the extent to which the 'servient' party entrusted the handling of its business affairs to the 'dominant' party and placed trust and confidence in it." *Smith v. GMAC Mortg. Corp.*, No. 5:06CV125-V, 2007 WL 2593148, at *6 (W.D.N.C. Sept. 5, 2007) (quoting *Monsanto*, 73 F. Supp. 2d at 546 (incorporating factors identified by Illinois courts; court discussed both Illinois and North Carolina law, as parties agreed that both states require similar showings)) (internal quotations omitted). Further, the *Monsanto* court stated that such a relationship will not be found where "there is no evidence that the alleged fiduciary agreed to exercise its judgment on behalf of the alleged dependent party." 73 F. Supp. 2d at 546.

SJ Order at 9-10.

At trial, it was incumbent on the plaintiffs to establish, through credible evidence, that McClain had a fiduciary relationship based in law, *with the Parkers individually*, founded upon McClain's services to the Parkers as either a real estate broker or as an agent. Alternatively, it was incumbent on plaintiffs to establish that McClain had a fiduciary relationship in fact, *with the Parkers individually*, due to the confidence they personally reposed in him together with McClain's control and domination over the Parkers in the context of that relationship. *See, e.g.*, *Danube Partners*, 659 S.E.2d at 451.

### B.    Plaintiffs' Initial Factual Contentions

The Parkers focused on certain key factual elements which served as the foundation for the breach of fiduciary duty claim, and other claims as well. As noted by the Parkers, "[t]hese causes of action are largely supported by the same facts." Plaintiffs' Response to Defendant's Motion for Judgment on Partial Findings ("Plaintiffs' Response") at 2 (DE # 246). The Parkers identified fifteen "core" facts that they sought to establish in their case-in-chief, as follows:

1.  Mr. McClain was educated and sophisticated.
2.  The Parkers were neither educated nor sophisticated.
3.  William Russ was neither educated nor sophisticated.
4.  The Parkers put their trust in Mr. McClain.
5.  William Russ put his trust in Mr. McClain.
6.  Mr. McClain acted as a real estate broker, a developer, a loan broker, a negotiator, a financial statement drafter, and an adviser to the Parkers individually.
7.  All of the professionals and experts involved in the case – both then and now – thought that Mr. McClain was a fiduciary.
8.  Mr. McClain dominated and controlled the Parkers.
9.  Even if there had been a signed development agreement, the stabilization fee which Mr. McClain alleges supports the alleged note was never earned.
10. Mr. McClain should not have spent significant money on the apartment development without first obtaining rights to the TTA land.
11. McClain failed to disclose and falsely indicated that he had control of the TTA land.
12. McClain should never have obtained or presented the two Georgia Capital loans.
13. Mr. McClain was the primary contact for the involved professionals and the Parkers were not, as alleged by Mr. McClain, surrounded and protected by a "team of professionals."

12

14.   Mr. McClain profited while the Parkers lost their fortune.

15.   Whatever note was signed is missing, the note being presented by Mr. McClain cannot be what was signed, and the note was intended to be replaced by an equity interest.

*Id.*  In the SJ Order, the court summarized the facts then alleged by the Parkers to show the existence of a fiduciary duty, as follows:

> The Parkers allege that a fiduciary relationship existed with McClain *at law* by virtue of McClain's service as either a real estate broker or as an agent, both of which are historically recognized fiduciaries. *See Howard v. Carroll Cos., Inc.*, No. 1:12CV146, 2013 WL 3791619, at *5 (M.D.N.C. July 19, 2013).  The Parkers also allege that a fiduciary relationship exists *in fact* in light of the professional advice and services McClain provided to the Parkers, upon which they relied heavily.  The Parkers maintain that they have no training, background or experience with bookkeeping, accounting, property management, property development or commercial loans, and as such, they *relied entirely on McClain's advice*.  The Parkers state that McClain knew of their exclusive and explicit reliance and assured them that he made recommendations in their best interests.  This, contend the Parkers, combined with their lack of relevant education and experience, placed McClain in a position of dominance over them.  In support of their asserted reliance, the Parkers offer the affidavits of several professionals employed by the Companies. Jeffrey Ellinger ("Ellinger"), counsel for the Companies, states that he was generally not sought out for advice:
>
>> My firms' primary contact with the Companies was initially William Russ.  Later, our primary contacts also included Casey Russ . . . and Conan McClain. . . . I met with Mr. and Mrs. Parker very rarely in relation to my representation of the Companies–probably 10 or fewer times in total.  I and other attorneys at my firms did not routinely consult with, advise or take instruction from Mr. or Mrs. Parker on matters relating to the Companies. . . .  The Companies typically did not involve me and my firms with its business and financial decisions.  Rather, decisions would typically be made without our involvement, and we would be asked to provide legal services only when needed for a specific purpose.

Ex. C to Pl. Parkers' Supp. Resp. in Opp., Doc. No. 110-3 at 3.  Ellinger further observed that "Mr. Russ and the Parkers relied upon Mr. McClain's professed expertise to guide them regarding development of the Seaboard Station retail and apartment properties and procuring suitable financing to advance that development." Id. at 4.  Likewise, the affidavit of James Tiller ("Tiller"), a certified public accountant at the accounting firm used by the Companies, stated that his firm did not communicate directly with the Parkers or advise them on important decisions, and

that McClain and Russ kept the firm at arms length. *See id.,* Ex. D, Doc No. 110-3 at 9. Tiller stated that his firm's primary contact with the Companies was through Russ and McClain.

In further support of this claim, the Parkers maintain that McClain caused them to grossly overextend themselves by obtaining high risk loans for development purposes in their own names, signing personal guarantees and pledging substantially all of their personal property as security. According to the Parkers, McClain advised them to execute personal guarantees of an interest rate swap agreement, a complicated and high-risk transaction that was inappropriate for unsophisticated borrowers such as themselves, between G&P and Regions Bank. Additionally, they allege that McClain counseled Mr. Parker in his individual capacity to execute a promissory note to McClain in the amount of $1,461,629.00 based on McClain's representations that it was needed to secure McClain's ownership interest in the apartment project. The Parkers allege that McClain represented to them that he was required to have an ownership interest in the apartment project in order to obtain HUD financing, and as a result, an agreement was reached that McClain would have a 25 percent ownership interest in the apartment site as compensation. In connection with the agreement, Mr. Parker was approached by McClain with the promissory note, allegedly to secure McClain's entitlement to the 25 percent interest. Mr. Parker asserts that although the note referenced an exhibit showing a calculation, no exhibit was presented to Mr. Parker at the time of execution on October 12, 2007. Rather, the exhibit attached to the version of the note filed with McClain's proof of claim bears a date of October 22, 2008, and purports to be a calculation of the stabilization fee to which McClain claims entitlement. Mr. Parker contends that the note was not presented to him as a personal promise to pay fees to McClain. Further, the Parkers state that the calculation of the stabilization fee is flawed in that it includes buildings developed by Trammel Crow, includes questionable or illusory leases in order to reach the 75 percent threshold, and uses figures that do not correspond with G&P's books and records.

The Parkers also maintain that in taking out loans from Georgia Capital, which included egregious terms and from which McClain was paid a substantial fee, they relied on McClain's representations that the appropriate arrangements were in place for the vitality of the project. In particular, the Parkers contend that McClain assured Mr. Parker that G&P – Seaboard II would be able to acquire ownership or control of the TTA property, which was vital to the success of the apartment project. The Georgia Capital loans were extended to Mr. Parker and guaranteed by G&P and Mrs. Parker.[9]

---

[9]The court recognized in the SJ Order that these were not all of the Parkers' allegations in support of this, and other, claims for relief. They were, however, the ones most likely to be asserting individual, rather than company, causes of action, and thus support a basis for recovery.

*Id.* at 11-13 (emphasis added).

The reason that the court includes these extensive excerpts of plaintiffs' pre-trial forecasts of their evidence is to emphasize the extent to which it was understood by all concerned that what this case is all about – and what plaintiffs' evidence needed to do – was to establish that McClain *owed* (and breached) a fiduciary duty *to the Parkers* – not to the Companies, but to Mr. and Mrs. Parker individually.  As the Parkers' counsel reiterated prior to the beginning of the trial, "I think what this case is about however is clear to everybody.  It is our contention most fundamentally that Mr. McClain, a very sophisticated real estate individual, took advantage of a very uneducated, simple, frail old man and got – enriched himself greatly by doing so to the great detriment of the Parkers.  That's what the case is about."  Transcript of Hearing/Trial held Feb. 2, 2016, at 8-9 (DE # 205).

### C.    Findings of Fact

While both Mr. and Mrs. Parker have limited formal education, both had a working familiarity with commercial real estate transactions which they acquired essentially through "on the job training" after Mr. Parker inherited his father's extensive estate in 1990.  The Parkers personally engaged in a wide range of activities attendant to real estate development (initially, primarily residential development) prior to pursuing the commercial and retail development of the Seaboard Station property.  The Parkers were not "sophisticated" within the typical understanding of the word.  They were, however, capable of recognizing the extent of their own knowledge and limitations, hiring people qualified to provide the services they and/or the Companies needed, and establishing their preferred way of doing things.

15

In particular, Mr. Parker's ownership of these extensive assets facilitated the Parkers' ability to be as involved, or as disengaged, as they wished to be in operation and oversight of the Companies and in management, sale, and development of the real property. The Parkers retained full and final authority to make decisions on behalf of the Companies: Mrs. Parker signed virtually all of the Companies' checks, and thus had or should have had a full picture of the Companies' expenditures, and Mr. Parker was the final authority and signatory with respect to the Companies' decisions. Notwithstanding their practice of exercising final authority in these areas, however, the Parkers consistently displayed little interest in the day-to-day operation of the Companies. This disassociation and their cultivation of a superficial, almost ceremonial role with respect to their business interests was not attributable to any undue outside pressure or exclusionary measures by the various professionals (including McClain) retained by the Companies or the Parkers personally; instead, it reflected the Parkers' way of doing things.

Mr. Parker in particular primarily relied on the advice and counsel of William Russ, a personal friend and Mr. Parker's "mentor," whom Mr. Parker retained to manage Seaboard Station in approximately 1999. Beginning in approximately early 2005 and at all times relevant to this action, Russ was the primary point of contact between the Parkers and other professionals, *including* McClain, who provided services to the Companies and/or the Parkers. These professionals included attorneys at law firm Jordan Price, which represented the Companies and, at various points in time, the personal interests of one or both Parkers, before and during McClain's involvement with the Seaboard Projects. Russ was the primary contact between Mr. Parker and attorneys Jeffrey Ellinger ("Ellinger") and Jeff Goebel ("Goebel") of Jordan Price. The evidence did not support the Parkers' contention that they were controlled and dominated by McClain. Ellinger testified, credibly, that

16

"Mr. Parker was certainly competent, and Mr. Parker chose to limit our communication, and limit his interest and his engagement the way that he did, and I didn't see anything wrong with that. If that's what the client chooses, and the client is comfortable with that, then I think the client is entitled to have it their way." Transcript of Hearing/Trial held March 17, 2016, at 41 (DE #214). Ellinger testified, and the court finds, that "Mr. Parker would only tolerate a certain level of communication with me because that's all that he was interested in.... An average person would want to be engaged, and would want to discuss, and would welcome the discussion, and would not arbitrarily terminate it, or quickly terminate it, or turn it away." *Id.* at 39-40. Mr. Parker preferred to focus on his own personal interests, Ellinger testified, and when he sought to talk business with Mr. Parker, he would "make it short and sweet, and then ask him if he understood, and then we'd move on to something else." *Id.* at 40-41.

McClain was employed by and performed services for the Companies, after his departure from Trammel Crow[10]. Neither Mr. nor Mrs. Parker was entirely sure of how the Companies came to employ McClain. In his deposition, Mr. Parker testified that he was not involved in the decision to end Trammel Crow's involvement in development of Seaboard Station, was not consulted with respect to that decision, and had no role in hiring McClain. Mr. Parker did not complain about this hiring because he "thought the man was going to do me honest and right." He testified that Russ hired McClain without first consulting him and that he "would presume" that McClain reported

---

[10]Plaintiffs' evidence established that McClain, on behalf of Trammel Crow, did refer to Trammel Crow acting "in a fiduciary manner" with respect to Gregory & Parker in the 2003 Letter of Intent for Development Agreement for Seaboard Station. This letter of intent was sent by McClain to William Russ. Plaintiff's Ex. 5. This evidence is immaterial, however, because it is disassociated in time and context from the question of whether McClain, personally, and years later, owed a fiduciary duty to the Parkers individually.

directly to Russ.  Mr. Parker testified that he never asked McClain to report directly to him.  He testified that Russ was "his mentor," and also that he didn't complain to Russ because that was simply not done.  Mr. Parker testified that he was not consulted about business decisions and did not read documents presented to him for signature, which would be brought to his home in Johnston County[11] and "throwed in my face.  Sign this."[12]

Mr. Parker's testimony was at times not credible, as when he testified that he never attended a closing for any loan, "never read nothing from Four Oaks Bank at no time," did not remember signing a personal financial statement for Georgia Capital LLC, and more generally that he "reviewed no documents before I signed them."  It was apparent from Mr. Parker's demeanor that he was aggrieved on multiple grounds and felt ill-used by others who made decisions on his behalf.  Much of this frustration appeared to be reflective of his personality, the limitations of a spotty memory regarding events in which he was not fully engaged to begin with, and a tendency toward hyperbole.  For example, the court does not accept Mr. Parker's testimony literally in that it does not believe that any of the professionals who brought documents to the Parkers' home threw the documents in the direction of Mr. Parker and barked at him to sign them.  To the contrary, and despite Mr. Parker's evidence in this regard, there was an abundance of credible evidence from Ellinger, Goeble, and McClain that they thoroughly explained various things to him, yet Mr. Parker consistently appeared to be distant and uninvolved and wasn't inclined to engage with the information being provided to him on anything more than a superficial level.  The testimony

---

[11]The court credits the testimony of others, including attorney Goebel, that closings on the loans took place in the law offices of Jordan Price, not in Johnston County.

[12]Mr. Parker's testimony is set out in the transcript of videotaped deposition of William Douglas  Parker, Jr. (Oct. 19, 2014).

established further that Mr. Parker harbored unfounded suspicions (*i.e.*, of communists and Nazis taking over) of entities with which either he or the Companies did business, including the City of Raleigh and the Triangle Transit Authority.  The court is aware that Mr. Parker was, at the time of his testimony, in the throes of a terminal illness that may have affected his demeanor.

After McClain began work for the Companies, he was in frequent contact with Russ, Ellinger, and others.  The parties disputed whether McClain undertook his responsibilities for the Companies pursuant to a literally "slip-sheeted" version[13] of the Trammel Crow Development and Services Agreement (Plaintiffs' Ex. 15, the "TC Agreement"), but ample evidence demonstrated that he did in fact perform, for the Companies, the same general services required under the TC Agreement, and that McClain was compensated by the Companies as provided for in the agreement. The TC Agreement stipulated that Trammel Crow provided services as an independent contractor. *Id.* at 2.

In this context, McClain received leasing commissions for his work.  The TC Agreement was the basis for his assertion that he was owed a stabilization fee, a portion of which was paid by the Companies in October 2007.  The remainder of that stabilization fee is reflected in payments and in the Promissory Note made by Mr. Parker to McClain, which is the basis of McClain's Claim 5-1.[14]  McClain also, at various times, brokered transactions for the Parkers personally (as opposed to

---

[13]The court makes no finding of fact on this point at this time because it is not material to the fiduciary duty (and related) issues, and instead pertains more directly to establishing the validity and amount of McClain's claim; moreover, McClain has not yet put forward his direct evidence pertaining to this claim.

[14]Again, the court does not include, in this memorandum opinion, any findings of fact with respect to whether the stabilization fee was earned, properly calculated, or accurately reflected by the terms of the Promissory Note. Those findings are not germane to the threshold issue of whether McClain owed to the Parkers a fiduciary or similar special duty, which the court has determined to be dispositive.  They are, however, material in the context of the Parkers'

transactions performed for a G&P entity), but those transactions are not at issue in this adversary proceeding. Regarding the apartment project, the development services agreement between McClain and Gregory & Parker Seaboard II requires McClain, as a "service provider," to use "commercially reasonable efforts" in his work for Gregory & Parker Seaboard II. Plaintiffs' Ex. 66 at 2 ("Development Agreement"). The Development Agreement identifies McClain as an independent contractor:

> Article 2. **Appointment**. Owner hereby appoints Service Provider and Service Provider hereby accepts the appointment, according to the terms and conditions hereinafter set forth, as an independent contractor and not as an agent, to be the exclusive manager for the Project with responsibility for implementing Owner's decisions regarding the development, construction, management, leasing and completion of the Project, subject to the terms and conditions herein.

*Id.* at 2. The agreement is dated October 27, 2008, and was signed by McClain and Mr. Parker (with copies to the Companies' counsel, Jeffrey Ellinger of Jordan Price).[15]

Mrs. Parker testified that she trusted McClain, and that McClain's advice was the only advice the Parkers followed in agreeing to take out the Georgia Capital loans. She and Mr. Parker received advice from others as well. Both Ellinger and Goebel testified that they advised the Parkers to not go through with the second Georgia Capital transaction, but the Parkers chose to do so anyway. Mrs. Parker testified that McClain assisted with non-Seaboard transactions as well; he helped negotiate the purchase of the Whitley tracts, helped obtain the line of credit to pay the Regions Bank

---

objection to McClain's claim(s), as to which factual findings would be premature because McClain has not yet put forward his own evidence in support of his claim.

[15] Plaintiffs appeared to be aware of the dearth of evidence supporting their argument that McClain owed to the Parkers a fiduciary duty based in law, and did not focus overmuch on this aspect of their breach of fiduciary claim; instead, they devoted most of their energies to establishing a fiduciary duty based in fact. To the extent plaintiffs' evidence could sometimes support either or both of those theories, the court evaluated the evidence from both angles.

debt, helped to negotiate an agreement with the gas company, prepared their financial statements and presented them for signature, assisted in getting a line of credit on the South Saunders Street property (owned by Mr. Parker, not Gregory & Seaboard), and in setting up an auction.[16] Plaintiffs' Response at 52-53 (citing notable excerpts from Mrs. Parker's testimony); *see also generally* Transcripts of Hearing/Trial held June 2 & 3, 2016 (DE # 217, 2018), August 2, 2016 (DE # 219) (complete testimony of Mrs. Parker).

Mrs. Parker testified that changes in bookkeeping practices took place after McClain came to be involved: "Conan told me personally that I can no longer do everything by pencil and paper. I need to get with the Twentieth Century and have everything all in one house. Everything should go to Raleigh and be put on the computer, I guess QuickBooks, and that was that." Asked whether the law firm Jordan Price had a "duty to answer to you as an officer of the company, didn't they?" Mrs. Parker testified that "[h]e answered to Conan and William [Russ]."[17] She testified that Mr. Russ failed to provide adequate information for them to decide whether or not the checks she was to sign were properly payable, beginning "when Conan and Casey [Russ] came to work for us," that McClain and Casey Russ made the decision to hire bankruptcy lawyers without consulting her, and that the following exchange took place between her and McClain, after she met with Mr. Sparkman outside of McClain's presence: "I was sitting there by myself with Conan and he just said well – took his hands and put them on his chest as says I've – I've done nothing wrong. You got nothing

---

[16]Mrs. Parker testified at length. These examples, and the excerpts of testimony cited below, are those specifically highlighted by plaintiffs for the purposes of illustrating the breadth of services provided by McClain to the Parkers, allegedly illustrating domination and control by McClain, etc.

[17]Like Mrs. Parker, Mr. Parker also at times responded to questions about Jordan Price, the law firm, or Trammel Crow, the development company, as if the firm or company was an individual person of that name.

21

on me.  I run everything.  I have my computer, Casey has her computer and William has your computer, and I tell Casey what to do."[18] Plaintiffs' Response at 61 (citing notable testimony).

Regarding the TTA, Mrs. Parker testified that McClain met with her and Mr. Parker at their home and said that "they were going to try and buy the property and he said that they were going to buy it.  That's what he told us.  We were going to buy it.  They were going to sell it to us."  Asked whether McClain indicated at that time that TTA was in agreement with the sale, she replied, "Yes. I thought there was a contract with that."  Further, Mrs. Parker replied "No" when asked whether, prior to closing the first loan with Georgia Capital, "McClain or anybody else [gave her] any indication that Triangle Transit wasn't on board with using the land that they owned for the apartment project."  She testified further that had she known at the time that rights to use the TTA land had not been acquired, the loan and pledge of personal assets "would have never happened," and that neither McClain nor anyone else gave her any indication that TTA land necessary for the apartment project was not under control.  Finally, she testified that McClain did not inform her that he'd never closed a HUD loan before and, speaking generally about the TTA property, that "every time I'd ask about it, they would say they're on board."[19]  *Id.* at 71-72 (citing notable testimony).

The court finds that Mrs. Parker's testimony was colored by her sincerely held belief that she could and should have been more informed about the Companies' business operations, as well as

------

[18]Plaintiffs presumably offered this evidence to suggest an implied threat by McClain; however, even if this comment was made as reported by Mrs. Parker, and was in fact intended to be an implied warning or threat by McClain that he could manipulate evidence (if that is what plaintiffs are inviting the court to presume), such comment was made after the occurrence of all of the events at issue in this proceeding and has no bearing on the existence or breach of any duty.

[19] It is unclear to whom Mrs. Parker is referring in saying that "'they' would say they're on board."

about her own obligations (and those of Mr. Parker) with respect to those operations. Mrs. Parker credibly testified that she had confidence in McClain, but the court finds that this confidence was not greater in nature or degree than the trust and confidence she and Mr. Parker reposed in other professionals, nor should it have been. Both Mrs. and Mr. Parker hoped and believed that McClain's efforts would prove successful, and would result in significant financial returns for them. Those efforts had more potential upside as well as more risk riding on them, as compared to other aspects of the Parkers' business and real estate endeavors; this heightened interest, however, is not indicative of control or domination by McClain and gives rise to no special duty.

The testimony of the Companies' primary attorney, Ellinger, established that Russ trusted McClain, and the Parkers trusted Russ. According to Ellinger, this supported a fiduciary duty as between the Parkers and McClain. Ellinger testified:

> Because of the relationship that they enjoyed with Mr. McClain and Mr. Russ, and with the two of them in tandem, with the trust that they reposed in Mr. Russ, which extended to Mr. McClain because of the tremendous and absolute trust that Mr. Russ had in Mr. McClain. And I believe that they followed his advice, without question. They did not inquire of me whether or not they should or should not follow his advice. Mr. Russ would not entertain any notion that Mr. McClain's advice was anything other than absolute and in their best interest. And on the one occasion when I questioned that with Mr. Russ, he told them that they couldn't get along with[out] Conan McClain, and there was no possibility that he would do anything wrong, or that anything that he told them couldn't be trusted. That, to me, equates to tremendous trust, particularly from Mr. and Mrs. Parker, who were not very sophisticated people.

Transcript of Hearing/Trial held March 16, 2016, at 175-76 (DE # 213).

Regarding McClain's investment in Capital City Grocery, Ellinger testified that he knew about that investment at the time it took place, that he believed Russ and the Parkers knew about it, and that McClain "was aboveboard with it." *Id* at 74. Regarding the Georgia Capital loans, Ellinger testified that he expressed no view to the Parkers as to whether the first Georgia Capital loan was

23

a good idea.  Regarding the second loan, Ellinger testified that he "was asked by Conan McClain and William Russ to discuss it with the Parkers and give them advice about whether they should enter into it."  *Id.* at 73.  Ellinger urged the Parkers to not go through with the loan: "During a meeting with the Parkers at their house, I told them in my opinion, they should not enter into it, that it was a bad deal for many reasons, and that they should run, not walk, away from it.  And that the only reason they should enter into it was if they had absolutely no other choice."  *Id.*

Attorney Goebel testified that he met with the Parkers on multiple occasions to explain and effectuate loan closings, and that he believed the Parkers had every right to expect McClain to act in their best interest.  Transcript of Hearing/Trial held August 3, 2016, at 54 (DE # 220).  In his dealings with McClain, Goebel testified, he had no reason to believe that McClain was ever *not* acting in the best interest of the Parkers, and would have told the Parkers if he did.  *Id.* at 47.  He testified that he fully explained the loans to the Parkers and was satisfied that they understood both the content and the implications of the transaction: "I would not let them leave the room if I did not think they understood what they were getting into."  *Id.* at 20.  Regarding the first Georgia Capital loan, Goebel testified: "I do not recall having concerns about that loan, other than I thought that the reserves that they requested were on the high end of reasonable."  *Id.* at 24.  Regarding the second loan, he testified that he understood that "the purpose of the second loan was to cover what I believe was a delinquency in the first loan.  So we knew at that point that there was some issues with repayments there.  And that's why I made specific points to them regarding the security that they were putting up, additional security for the second loan because they were already in a difficult position."  *Id.* at 23-24.  Goebel spoke to McClain about it and "we agreed to have the meeting with the Parkers."  Goebel could not recall whether McClain had specific concerns about the loan, but

24

"certainly did not argue with me either that he thought it was a good loan" and gave no push-back on the idea of meeting with the Parkers. *Id*. at 26. The Parkers decided to not go forward with the loan, and Goebel contacted Georgia Capital to call it off. The Parkers subsequently did go forward with a modified loan agreement. *Id*. at 28-29.

Brett Mueller of Capital Associates testified that in his opinion, real estate brokers and especially developers consider themselves to owe a fiduciary duty to their "clients." Plaintiffs maintain that of these professionals, Mueller "stated it best" when he testified that he had never before seen a case "this bad," where there were "no checks and balances, no accountability and I've never seen an investor go from no leverage with a lot of assets to this kind of damage. ... But I personally have never seen a case where there was no one else except for one person that understood everything that was going on. There was no one else that challenged what was going on."[20] Transcript of Hearing/Trial held August 3, 2016, at 83 (DE # 220). Ira Morris testified that individuals who retain a real estate broker, developer, or "any professional" have a right to expect the professional to perform the contracted services in a professional manner. Transcript of Hearing/Trial held June 1, 2016, at 156 (DE # 216). The testimony of Elizabeth Beatty, a CPA admitted as an expert in forensic accounting, was not relevant to the court's threshold fiduciary duty determination; it will, however, be material in connection with McClain's proof of claim. Transcript of Hearing/Trial held March 17, 2016, at 133 (DE # 214).

---

[20]Ellinger, however, testified that at various times, depending on the nature of the legal services performed, he considered the Parkers (as opposed to the Companies) to be his clients. In closing the Georgia Capital loans, which were in the Parkers' names as guarantors, he considered the Parkers to be his clients and both he and Goebel advised them fully with regard to the pros, cons, and ramifications of the transactions.

### D.    Conclusions of Law

Having reviewed and considered all of the testimony and admitted exhibits, and considering that evidence together with the applicable law (discussed above in Section A), the court finds that the evidence established – thoroughly – that to the extent McClain was retained to perform services for the Companies pursuant to either a written agreement or to an unwritten understanding modeled upon a written agreement, he was retained as an independent contractor.  The evidence did not establish and in fact affirmatively precluded the existence of a fiduciary duty in law as between McClain and the Parkers.

Similarly, with regard to the existence of a fiduciary duty in fact, plaintiffs' evidence established that the Parkers trusted and relied upon McClain in much the same way and to the same extent that they trusted and relied upon the other professionals who provided services to them and to the Companies, with the exception of Russ, in whom the Parkers reposed a greater degree of confidence.  Plaintiffs' evidence was insufficient to establish requirements essential to the existence of a fiduciary duty: Specifically, the court determines that the Parkers' trust and confidence in McClain was of the nature and scope that one reasonably would expect to repose in any hired professional, and did not exceed that scope.  The evidence did not support and in fact was inconsistent with the Parkers' claim that they were subject to the exercise of "superiority and influence" by McClain.  Further, the Parkers were not "dominated and controlled" by McClain as a result of their trust and confidence.

In sum, the evidence did not establish any unique, personal relationship of trust between McClain and the Parkers, and did not establish that McClain exercised dominion or control over the Parkers individually and/or over the process by which they reached their decisions.  The court

concludes that the Parkers' reasonable expectations of McClain were largely coextensive with their expectations of the group of other highly trained professionals entrusted to carry out the Companies' objectives. To be sure, the professional obligations McClain undertook on behalf of the Companies were extensive, complex, multi-faceted, and high-stakes in nature; this, however, does not give rise to a fiduciary obligation to the Parkers. Determining whether such a dynamic exists requires analysis of a range of factors (such as kinship, disparity of age, health, mental condition, education, and business experience, as discussed earlier) and, having undertaken that analysis, the court readily agrees that McClain was demonstrably more educated, sophisticated, and experienced in real state development than the Parkers. Therein lies the reason he was hired, and the same is true of every other professional having anything to do with this case. Regardless of whether their decision to do so was wise, the uncontrovertible fact is that the Parkers maintained ultimate authority over the Companies and their extensive assets while refraining from becoming truly engaged with the meaningful details of running those businesses.

Plaintiffs' evidence established that significant decisional components were laid out for and discussed with them on numerous occasions by, for example, Ellinger and Goebel. These non-defendant professionals testified, credibly, that they imparted complete advice that, in their opinions, the Parkers actually understood. Goebel, for example, testified that he went through the closing documents for the Regions Bank and Georgia Capital loans thoroughly, including a line by line discussion of the loan disbursements. Regarding the second Georgia Capital loan, which he discussed in a meeting at his office with plaintiffs, McClain, and perhaps others, Goebel testified that he was satisfied that the Parkers knew his view of the loan terms, considered his opinion, and

were within their rights to disregard that opinion and to proceed forward with the loan.[21]   The evidence showed that the Parkers' working comfort zone consisted of writing checks and signing documents brought to them; they were complacent with, cavalier about, and often insistent upon conducting their affairs in this manner for many years, beginning long before Trammel Crow, McClain, and the Seaboard redevelopment ever came up.  That was their prerogative.

In sum, to the extent that the Parkers, in their personal capacity, had trust and confidence in McClain, that relationship was commensurate with the nature and degree of confidence to be expected of them in hiring McClain to perform professional services on behalf of the Companies, and the influence exercised by McClain in performing those services did not approach the level of "domination or control."  *See SNR Mgmt. Corp. v. Danube Partners 141, LLC*, 659 S.E.2d 442, 451 (N.C. App. 2008) ("Only when one party figuratively holds all the cards – all the financial power or technical information, for example – have North Carolina courts found that the special circumstance of a fiduciary relationship has arisen."); *Eastover Ridge, LLC v. Metric Constructors, Inc.*, 533 S.E.2d 827, 832 (N.C. App. 2000) (no fiduciary relationship between apartment project owner and contractor where owner's representative actually oversaw the project).  The evidence did not support plaintiffs' contentions that they were improperly induced to accept McClain's advice, that McClain sought to induce them to act on advice that he knew or should have known would be

---

[21]For the convenience of the witness and with the consent of plaintiffs, Goebel's testimony went beyond the bounds of cross-examination to include evidence pertaining to his negotiations with the TTA, among other things.  He testified that he had no indication from TTA that they would *not* go through with conveying a property interest to Gregory & Parker, and further that "had they done that we would have gone in a different direction."  He testified that TTA would "always give you lip service on what they were willing to do," but then "when it came to actually the rubber hitting the road nothing would get accomplished."  His "experience with TTA overall" in general terms was that they would tell him one thing, but then not carry through.

both detrimental to the Parkers and beneficial for him, or that they were not provided with sufficient information to make informed decisions. Rather, ample evidence established that plaintiffs were not inclined to receive information from anyone other than Russ, and were regularly indifferent or resistant to information provided to them. Plaintiffs' evidence was entirely insufficient to establish that McClain owed to the Parkers a fiduciary duty rooted in either law or fact. On the second cause of action ("Breach of Fiduciary Duty") in the First Amended Complaint, judgment was entered for McClain. Having found that McClain did not owe a fiduciary duty to the Parkers, there was no basis for the court to consider the alleged breach of such a duty.

## II.   Fraudulent Transfers Claim

The Parkers' claim for constructively fraudulent transfers under the North Carolina Uniform Fraudulent Transfer Act is based on payments they made to McClain totaling $318,830.00 between July 27, 2007 and August 28, 2009. In the SJ Order, the court concluded that there were no genuine issues of material fact as to whether the Parkers had unreasonably small assets. Accordingly, they could not rely on N.C. Gen. Stat. § 39-23.4(a)(2)(a) to prove their claim of constructive fraud and were required instead to rely upon N.C. Gen. Stat. § 39-23.4(a)(2)(b).[22] SJ Order at 23. The court

---

[22]North Carolina General Statute § 39-23.4(a)(2) provides, in pertinent part, that: (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
. . . .
(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, ***and*** the debtor:
a. . . .
b. Intended to incur, or believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

§ 39-23.4(a) (emphasis added).

also held that several of the payments were barred by the applicable statues of limitation. *Id.* at 16, 21. Thus, at trial, it was incumbent on the Parkers to show that the remaining amount of the payment made was a constructively fraudulent transfer because they did not receive reasonably equivalent value in exchange *and* that in making that transfer, they intended to, or believed that they would, incur debts beyond their ability to repay.

In the SJ Order, the court held that genuine issues of material fact existed with regard to whether the Parkers received reasonably equivalent value in exchange for the transfer in large part because "neither party clearly enunciates an argument or supporting facts as to this element," such that the court was "left only with contrasting allegations." *Id.* at 22. The court expressed its particular interest in determining, at trial, whether the payments were made in satisfaction of corporate debts owed by the Companies, or individual debts owed by the Parkers. The court also noted that constructively fraudulent transfers grounded upon a debtor's inability to repay debts have an additional *scienter* element: the debtor must have intended to, or believed that it would, incur debts beyond its ability to repay. § 39-23.4(a)(2)(b). As to that, the court explained:

> With regard to whether the Parkers possessed the requisite intent, Mr. Parker's awareness of the recurring need to borrow substantial amounts of money and the Parkers' sole control over their bank accounts could lead to an inference that they could not have reasonably believed they would be able to repay their debts. On the contrary, Mr. Parker's professed unawareness of signing financial documents and the Parkers' ignorance of the terms of the loans is evidence that they did not have any such intent or belief. *See* Ex. B to Pl. Parkers' Supp. Resp. in Opp., Doc. No. 110-2 at 30-31 (stating that he did not remember signing personal financial statements, and that he never read the personal financial statements that he signed). The conflicting evidence as to the Parkers' intent and ability to repay precludes summary judgment on whether the Parkers made the transfers intending to or believing that they would incur debts beyond their ability to repay under N.C. Gen. Stat. § 39-23.4(a)(2)(b). Summary judgment on the Parkers' fraudulent transfer claim under N.C. Gen. Stat. § 39-23.4(a)(2) is therefore denied.

SJ Order at 25-26.

The parties do not specifically address this claim and the unresolved aspects of it in the Final Pretrial Order or in their post-trial memoranda, nor was it the subject of plaintiffs' focus at trial. It may be that the claim is abandoned. In the event that it is not, however, the court finds that the evidence at trial did not support the conclusion (or even the inference) that the Parkers intended to, or believed that they would, incur debts beyond their personal ability to pay. To the extent that plaintiffs' first cause of action ("Fraudulent Transfers") remained viable, judgment on that claim was entered for McClain.

## III.   Constructive Fraud

To establish a claim for constructive fraud, a plaintiff must show that it and the defendant stood in a "relation of trust and confidence . . . [which] led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of the plaintiff." *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 666, 488 S.E.2d 215, 224 (1997) (quoting *Rhodes v. Jones*, 232 N.C. 547, 61 S.E.2d 725, 726 (1950)) (internal quotations omitted). Constructive fraud differs from actual fraud in that it is founded on the existence of a confidential relationship rather than a specific misrepresentation. *Barger*, 346 N.C. at 666, 61 S.E.2d at 224. Implicit in the required showing is that the defendant sought to benefit himself. *Id.*

Here, the Parkers' claim of constructive fraud relies on the same evidence offered to establish their claim for breach of fiduciary duty. Plaintiffs' Response at 7 ("The same facts which support Plaintiffs' claims for breach of fiduciary duty support the claim for constructive fraud."). Namely, they sought to show that McClain enjoyed a position of trust and confidence as to the Parkers, which he used to cause payments and benefits to himself to the detriment of the Parkers. McClain maintained that the Parkers cannot establish this claim because there was no confidential

31

relationship and, further, because he kept the Parkers fully informed and did not make any misrepresentations.

As discussed above, the court has determined that McClain did not owe a fiduciary duty to the Parkers. With reference to that same fact and law, the court determines that the relationship between McClain and the Parkers was not one of "confidence and trust" sufficient to satisfy the required element of this claim. Nor is the court persuaded by the evidence presented that McClain "intended to benefit himself *to the Parkers' detriment*." There is no question that McClain sought to benefit himself, and he certainly did so, but plaintiffs' evidence did not support their assertions that McClain continued to pursue and advocate for the apartment project – including his role in procurement of the Georgia Capital loans – with any knowledge or intent that the project would fail, such that he personally would benefit while the Parkers incurred losses. On the third cause of action ("Constructive Fraud"), judgment was entered for McClain.

## IV.    Fraud

As previously noted by the court in the SJ Order, under North Carolina law, fraud encompasses "all acts, omissions, and concealments involving a breach of legal or equitable duty and resulting in damage to another, or the taking of undue or unconscientious advantage of another." *Vail v. Vail*, 63 S.E.2d 202, 205 (N.C. 1951) (quoting 37 C.J.S., Fraud, at 204) (internal quotations omitted). A *prima facie* case for fraud consists of five elements: (1) a false representation or concealment of a material fact; (2) reasonably calculated to deceive; (3) made with intent to deceive; (4) that actually deceives; and (5) results in injury to the deceived party. *Vail*, 63 S.E.2d at 205 (quoting *Ward v. Heath*, 24 S.E.2d 5, 7 (N.C. 1943)).

In the SJ Order, the court concluded that there were genuine issues of material fact regarding the occurrence of a false representation or material concealment, as the circumstances surrounding the transactions and the parties' interactions were disputed. The following factual disputes were especially pertinent to a resolution of this claim: whether McClain falsely represented that TTA was "on board" with the development of the apartment site; whether McClain obtained a promissory note from Mr. Parker by representing it as a means to secure McClain's 25 percent ownership interest in the Seaboard apartment site when in actuality it constituted a promise to pay the stabilization fee; and whether McClain claimed entitlement to a stabilization fee when not all conditions precedent had been satisfied. There also were contrasting allegations and evidence, and therefore genuine issues of fact, as to whether McClain acted with the intent to deceive or acted with a legitimate business purpose. With regard to whether the Parkers reasonably relied and/or whether McClain breached a duty to disclose, the court also found that genuine factual issues were present, based largely on the then-open question of whether McClain owed (and breached) fiduciary duties to the Parkers.

From the perspective of the Parkers' actions, the SJ Order noted that there were genuine issues of fact as to the Parkers' reasonable reliance in light of their insistence that they lacked any business or financial acumen and relied on McClain for virtually all business decisions because McClain represented that he had a great deal of expertise. The Parkers alleged, and it was affirmed by the statements of hired professionals, that they relied on McClain to find loans, and executed guaranties and pledged their personal property upon his advice. Last, there were disputes regarding whether the Parkers suffered injury in their individual – as opposed to corporate – capacity as a result of the alleged misrepresentations and concealments.

At trial, the Parkers sought to support the factual allegations set forth in their fourth cause of action, which (in generalized terms) claimed that McClain had an affirmative duty to disclose to the Parkers that TTA had not agreed to convey ownership, but misrepresented that TTA was "on board", that he failed to disclose TTA's failure to agree, and that these misrepresentations were made with the intent to deceive, which they did, resulting in injury.  Further, that McClain had an affirmative duty to disclose to the Parkers that Capital City Grocery was not paying rent, was defunct, and that he owned an interest in/controlled the entity that owned the grocery, but made false representations to the contrary, and these misrepresentations were made with intent to deceive, and did so, resulting in injury.

Plaintiffs' evidence did not establish a prima facie case of fraud.  The evidence did not show that McClain, or anybody else, had actual knowledge or a belief at a relevant time – *i.e.*, prior to the Georgia Capital closings or significant expenditures of cash – that the TTA deal would fall through.  The evidence establishes that those involved were "cautiously optimistic" prior to the time that it became clear that TTA would not be party to the kind of deal that the Companies needed.  This realization was followed by efforts to redirect the course and get the deal back on track, which failed.  Conspicuously absent from plaintiff's evidence were expressions of doubt or concern on the part of any individual – including McClain – working on the TTA transaction as to whether a sale would close or a satisfactory easement arrangement could be reached.  There were myriad questions as to price, timing, and the implications of other factors like the prospective light rail system, yet all of the people involved expected the effort to end with acquisition of the TTA property.  Plaintiffs evidence establishes that McClain, and others, believed and expected that the necessary TTA deal would come to fruition, which proved to be in error.  As to the allegation that McClain sought to

34

improperly "prop up" Capital City Grocery in order to receive the stabilization fee, again, plaintiffs did not introduce evidence sufficient to establish the required elements of that claim. Instead, credible evidence, including Ellinger's testimony that McClain "was aboveboard with it," indicated that McClain did not conceal his ownership interest in the grocery.[23]  Transcript of Hearing/Trial held March 17, 2016, at 74 (DE# 214). The evidence did not establish that McClain knew and/or concealed material facts from the Parkers or that he made false representations with respect to them, and there was no evidence that McClain sought, in this context, to deceive the Parkers.  On the fourth cause of action ("Fraud"), judgment was entered for McClain.

## VI.    Negligent Misrepresentation

Negligent misrepresentation occurs when, "in the course of a business or other transaction in which an individual has a pecuniary interest, he or she supplies false information for the guidance of others in a business transaction, without exercising reasonable care in obtaining or communicating the information." *Fulton v. Vickery*, 326 S.E.2d 354, 358 (N.C. App. 1985).  This cause of action boils down to four elements: (1) justifiable reliance by a party; (2) to its detriment; (3) on information prepared without reasonable care; (4) by one who owed the relying party a duty of care. *Brinkman v. Barrett Kays & Assocs., P.A.*, 575 S.E.2d 40, 43-44 (N.C. App. 2003).  Further, liability is limited to loss suffered:

> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

---

[23] Whether the grocery was at that time a legitimate, viable tenant for purposes of calculating the stabilization fee is a different question that the court does not need to reach in this opinion.  It pertains more directly to McClain's proof of claim, and will be addressed in that context.

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

*Id.* at 43 (quoting Restatement (Second) of Torts § 552 (1977)).  North Carolina courts have stated that summary judgment is rarely proper on a negligent misrepresentation claim, as liability is "highly fact-dependent" and the question of whether a duty is owed is of "paramount importance." *Brinkman*, 575 S.E.2d at 42 (quoting *Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP*, 513 S.E.2d 320, 325 (N.C. 1999)) (internal quotations omitted).  Accordingly, the court held in the SJ Order that summary judgment would not be appropriate because there were, at that time, factual issues regarding McClain's fraudulent intent.

The Parkers contend that the factual allegations supporting their other causes of action also support this claim for negligent misrepresentation.  Based upon the factual findings and conclusions of law discussed above, the court determines that plaintiffs' evidence did not establish the existence of any duty owed by McClain to the Parkers individually sufficient in nature or scope to support this claim. On the fifth cause of action (Negligent Misrepresentation), judgment was entered for McClain.

## VI.    Negligence

Under North Carolina law, the essential elements of a negligence cause of action are the existence of a legal duty or standard of care, breach of that duty, and an injury proximately caused by the breach.  *Stein v. Asheville City Bd. of Educ.*, 626 S.E.2d 263, 267 (N.C. 2006); *Harris v. Daimler Chrysler Corp.*, 638 S.E.2d 260, 265 (N.C. App. 2006).  In this context, plaintiffs must show that McClain failed to exercise the requisite level of care in the performance of a duty owed *to them*, with a resulting breach of that duty being the proximate cause of their injury.  *Estate of*

36

*Hendrickson v. Genesis Health Venture, Inc.*, 565 S.E.2d 254, 255 (N.C. App. 2002). And, plaintiffs

argue, professionals like McClain "owe a common law duty of care to those with whom they deal

in carrying out their contractual duties to the corporation that retained them." Plaintiffs' Response

at 28; *see also United Leasing Corp. v. Miller*, 263 S.E.2d 313, 318 (N.C. App.), *disc. rev. denied*,

267 S.E.2d 685 (N.C. 1980); *Davidson & Jones, Inc. v. New Hanover County*, 255 S.E.2d 580, 584

(N.C. App.), *disc. rev. denied*, 259 S.E.2d 911 (1979).

Plaintiffs contend that even if the court "views the testimony of Mr. McClain charitably, and

finds that his actions were not intentional, they were nevertheless negligent." Plaintiff's Response

at 10. In the First Amended Complaint, plaintiffs summarize and essentially rephrase the majority

of their allegations and grievances in the context of McClain's alleged violation of his "duty to use

reasonable care, both generally and as a professional developer and real estate broker, in his dealings

with the [C]ompanies and Mr. and Mrs. Parker ... in numerous ways."

Responding to McClain's motion for judgment on partial findings, plaintiffs reasoned that

> Mr. McClain was negligent in spending large sums of the Parkers' money on the
> apartment project without having control of the TTA land. Mr. McClain was
> negligent in finding and presenting both disastrous Georgia Capital loans. Mr.
> McClain was negligent in calculation and claiming entitlement to the stabilization
> fee.[24] ...

Plaintiffs' Response at 10. According to plaintiffs, their evidence "establishes that Mr. McClain's

'special relationship' with the Parkers gave rise to direct duties owed to them, which establishes one

of the two exceptions set forth in *Energy Investors*," discussed earlier. *Id.* at 27-28. Plaintiffs also

argue that McClain's services were "not solely corporate" because over the years he provided some

---

[24]The court noted earlier that issues pertaining to the stabilization fee (including
calculation of it) will be addressed in the context of the Parkers' objection to claim.

real estate work to the Parkers as individuals for properties owned by them, not the Companies, and because the Parkers (as opposed to the Companies) at times paid him directly.

Plaintiffs argue further that the "other exception, individualized injury separate from loss of corporate equity value, is also established by plaintiffs' evidence." *Id.* at 28. They maintain that they, as opposed to the Companies, have suffered extensive personal losses, including those attributable to the sale of real properties owned by them personally in order to repay amounts owed to Georgia Capital. *Id.* at 21-31. Those loans, as the Parkers point out, were made to Mr. Parker, with Mrs. Parker and Gregory & Parker as guarantors. *See* Plaintiffs' Exs. 78, 161, 164. An individual injury is asserted on behalf of Mr. Parker, to the extent that McClain may be able to recover on his claim on the Promissory Note. Plaintiffs maintain that here, McClain's "negligent performance of contractual duties" gives rise to liability to the Parkers as individuals under the balancing process discussed in *United Leasing Corp. v. Miller*:

> Whether or not a party has placed himself in such a relation with another so that the law will impose upon him an obligation, sounding in tort and not in contract, to act in such a way that the other will not be injured calls for the balancing of various factors: (1) the extent to which the transaction was intended to affect the other person; (2) the foreseeability of harm to him; (3) the degree of certainty that he suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury; (5) the moral blame attached to such conduct; and (6) the policy of preventing future harm.

*United Leasing Corp. v. Miller*, 263 S.E.2d 313, 318 (N.C. App.), *disc. rev. denied*, 267 S.E.2d 685 (N.C. 1980).

As has already been addressed, however, plaintiffs's evidence did not establish that McClain owed a fiduciary duty to them, and they do not come within either of the exceptions that could permit them to assert claims for a breach of duty owed to the Companies. Nor have the Parkers established that McClain owed any alternative lesser duty to them sufficient to support the

38

negligence claim.  For example, McClain's actions in calculating and claiming entitlement to the stabilization fee and in "finding and presenting both disastrous Georgia Capital loans" were contractual duties undertaken on behalf of the Companies, not the Parkers; moreover, plaintiffs' evidence established 1) the Parkers were fully counseled by two attorneys (Ellinger and Goebel) as to both of the Georgia Capital loans; 2) the Parkers were expressly counseled by both attorneys to not execute the second loan; 3) the Parkers were not subject to any undue pressure from McClain to disregard this advice; 4) the Parkers went through with both loans.  As to the assertion that "McClain was negligent in spending large sums of the Parkers' money on the apartment project without having control of the TTA land," the evidence established that the Parkers controlled both the decision-making and expenditures such that McClain did not actually "spend large sums of the Parkers' money" on anything, and that McClain and all other parties involved in the Seaboard apartment project anticipated reaching agreement with the TTA.  The evidence did not establish that McClain did forsee, or should have foreseen, that the TTA deal ultimately would not be consummated, nor did it establish that McClain withheld information from the Parkers or anyone else about the status of the negotiations.

Finally, with respect to McClain's assertion of the defense of contributory negligence, the evidence discussed above conclusively established that the Parkers retained authority to make final decisions with respect to all aspects of their various ventures, had access to multiple sources of information, yet were indifferent to much of the advice they actually received as well as the content and significance of the documents they signed.  "[O]ne who signs a written instrument, without being induced thereto through fraud or deception, cannot avoid its effect on the ground that at the time he signed the paper he did not read it or know its contents, but relied upon what another said

about it." *Harrison v. Southern Railway Co.*, 47 S.E.2d 698, 700 (N.C. 1948). The duty to read "is a positive one, and failure to do so, in the absence of any mistake, fraud or oppression, is a circumstance against which no relief may be had, either in law or in equity." *Id., quoted in* Holzworth v. Nationwide Mut. Fire Ins. Co., 616 S.E.2d 29, 2005 WL 1804346 *3 (N.C. App. 2005). Moreover, "[i]n this state, a plaintiff's contributory negligence is a bar to recovery from a defendant who commits an act of ordinary negligence." *Sorrels v. MYB Hospitality Ventures of Asheville*, 423 S.E.2d 72, 73-74 (N.C. 1992); *see also Davis v. Hulsing Enterprises, LLC*, 783 S.E.2d 765, 770 (N.C. 2016) (quoting same). Based upon the findings of fact and conclusions of law set forth herein, judgment was entered for McClain on the negligence claim.

## VII.    Conversion

It appears to the court that this claim has been abandoned. In the event that it is not, however, the court notes that it previously found, in the SJ Order, that the claim for conversion was dependent upon the claim for fraud. Based upon the findings of fact and conclusions of law set forth above, judgment was entered for McClain on this claim.

## IIX.    Unfair or Deceptive Trade Practices

Pursuant to N.C. Gen. Stat. § 75-1.1, "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." § 75-1.1(a). "'[C]ommerce' includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession." § 75-1.1(b). Plaintiffs' evidence needed to permit the court to find that (1) the defendant committed an unfair or deceptive act or practice; (2) the act was in or affecting commerce; and (3) the act proximately caused injury to the plaintiff. *Canady v. Mann*, 419 S.E.2d 597, 602 (N.C. App. 1992) (citing

*Spartan Leasing Inc. v. Pollard*, 400 S.E.2d 476, 480 (N.C. App. 1991)). The "business activities" contemplated by the statute include "the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized." *HAJMM Co. v. House of Raeford Farms, Inc.*, 403 S.E.2d 483, 493 (N.C. 1991).

As already discussed above, plaintiffs' evidence did not support their claim of fraud, which would have been sufficient to establish a violation of the statute. *E.g. Canady,* 419 S.E.2d at 602. Nor did the evidence establish that McClain engaged in conduct that had the capacity or tendency to deceive, or that was unfair: "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Opsahl v. Pinehurst Inc.*, 344 S.E.2d 68, 76 (N.C. App. 1986) (quoting *Johnson v. Phoenix Mut. Life Ins. Co.*, 266 S.E.2d 610, 621 (N.C. 1980)) (internal quotations omitted). As the court explained in the SJ Order, conduct is unfair when it "amounts to an inequitable assertion of [] power or position," *id.* (quoting *Johnson*, 266 S.E.2d 622)) (internal quotations omitted), or when an actor uses coercive tactics, *Wilder v. Squires*, 315 S.E.2d 63, 66 (N.C. App. 1984)). The evidence could support no such finding here. Accordingly, judgment was entered for McClain on the UDTPA claim.

## IX.    Remaining Claims

The ninth cause of action (Disallowance of Claim) aside, plaintiffs' remaining causes of action necessarily were dependent on the causes of action the court already has discussed. Based upon the findings of fact and conclusions of law set forth above, judgment was entered for McClain on the tenth (Setoff) and eleventh (Equitable Subordination) claims.

41

The motion for judgment on partial findings was denied with respect to the ninth cause of action (Disallowance of Claim) because that issue was not yet properly before the court.  As noted in the court's short order of March 30, 2017, McClain filed his proofs of claim in the underlying bankruptcy case, in response to which the Parkers objected and requested that any hearing on their objections be heard in conjunction with this trial in the adversary proceeding.  (Parkers' Objection to Conan R. McClain Claim Nos. 5-1, 6-1 and 6-2, DE #191 (Bankr. Case No. 12-03128-8-SWH)).

When a proof of claim is properly executed and filed, that claim is prima facie evidence of the validity and amount of the claim.  Fed. R. Bankr. P. 3001(f).  Upon objection by the debtors, the burden shifts to them to refute the claim with evidence of equal force.  The Fourth Circuit has explained the Bankruptcy Code's "burden-shifting" framework as follows:

> [T]he creditor's filing of a proof of claim constitutes prima facie evidence of the amount and validity of the claim. 11 U.S.C. § 502(a); Fed. R. Bankr. P. 3001(f). The burden then shifts to the debtor to object to the claim. 11 U.S.C. § 502(b); [*Canal Corp. v. Finnman (In re Johnson*), 960 F.2d 396, 404 (4th Cir. 1992)]. The debtor must introduce evidence to rebut the claim's presumptive validity. Fed. R. Bankr. P. 9017; Fed. R. Evid. 301; [4 *Collier on Bankruptcy*, ¶ 501.02[3][d] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2004]. If the debtor carries its burden, the creditor has the ultimate burden of proving the amount and validity of the claim by a preponderance of the evidence. (Footnote omitted.) *Id.* at ¶ 502.3[3][f].

*Stancill v. Harford Sands, Inc. (In re Harford Sands, Inc.)*, 372 F.3d 637, 640 (4th Cir. 2004); *see also, e.g., In re King*, 2016 WL 3648524 at *6 (Bankr. E.D.N.C. June 30, 2015) (Case No. 14-006010-5-SWH).  The court makes no official finding in this memorandum opinion, but it is readily apparent from plaintiffs' evidence that the debtors will satisfy that burden in the claims objection process, after which the burden of proof will revert to McClain to prove, by a preponderance of the evidence, the validity and amount of his claim.

## CONCLUSION

By order and accompanying judgment entered on March 30, 2017, the court entered judgment on partial findings for defendant McClain with respect to all claims set out in the First Amended Complaint other than the ninth claim ("Disallowance of Claim"), based upon the findings of fact and conclusions of law as set forth herein.

## END OF DOCUMENT